IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2019 Session

## STATE OF TENNESSEE v. RONALD AILEY

**Appeal from the Criminal Court for Hamblen County**
**No. 14CR619     Alex E. Pearson, Judge**

_____

### No. E2017-02359-CCA-R3-CD

_____

The Defendant, Ronald Ailey, was convicted by a jury of two counts of aggravated assault. Thereafter, the trial court imposed concurrent terms of four and one-half years, denied the Defendant's request for judicial diversion, and ordered the Defendant to serve six months' incarceration before being released on supervised probation. Upon the Defendant's motion for new trial, he argued that he received ineffective assistance of counsel due to trial counsel's failure to call exculpatory witnesses, failure to investigate and prepare for trial, failure to impeach certain State's witnesses, failure to prepare the Defendant to testify, failure to object to improper questioning of the Defendant on cross-examination, and failure to adequately advise the Defendant during plea negotiations. On appeal, the Defendant contends that the trial court erred by denying him judicial diversion or total probation and by applying certain enhancement factors. He also challenges the trial court's ruling that he received the effective assistance of counsel at trial. Upon a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Wade V. Davies (on appeal and at sentencing), Knoxville, Tennessee; and Jonathan M. Holcomb (at trial), Morristown, Tennessee, for the appellant, Ronald Ailey.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Dan E. Armstrong, District Attorney General; and Kimberly L. Morrison, Assistant District Attorney, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

On August 21, 2014, a confrontation occurred in a rural area outside Morristown known as "Boatman Mountain," during which the Defendant fired his handgun four times. Thereafter, the Hamblen County Grand Jury indicted the Defendant for two counts of aggravated assault by knowingly causing a ten-year-old girl ("the minor victim") and her thirty-three-year-old brother ("the adult victim"), to fear imminent bodily injury by displaying a deadly weapon. See Tenn. Code Ann. § 39-13-102. Following a jury trial, the Defendant was convicted as charged.

1. Trial. The 911 calls recounting the incident were entered into evidence at the beginning of trial. The first call was placed by the adult victim at 8:00 p.m., and he relayed to the operator that the Defendant had shot at him four times. Also at 8:00 p.m., a call came in from a neighbor, who lived at 1736 Boatmans Ridge Road, wherein the caller stated that a man in a white truck "just pulled up and started yelling" and shots were fired. This caller also said that the noise "could've been a firecracker." The next call came from the victims' father at 8:01 p.m. The operator asked the victims' father what was "the reason why [the man] was shootin' off the gun?" The victims' father replied, "I don't know the whole story[.]" The victims' father said that the shooter was "supposedly" the Defendant. The victims' father also told the operator:

> I mean I don't really know what happened. I live down here. That was my little girl and my boy, and (unintelligible) said there were gunshots fired. And some people up here seen it [sic], and I'm down here calming my little girl down, and he was hollering. I don't know if my, the lady came up there and jumped all over him, and he called her a b---h or what, but my God, that doesn't give him right to come out here with a gun.

The adult victim called again at 8:12 p.m. to see how much longer before the officers arrived.

The Defendant's wife called 911 at 8:15 p.m. She relayed her version of events and informed the 911 operator that her husband had returned home. At 8:20 p.m., an officer phoned the Defendant's residence and spoke with the Defendant, telling "him to stay put[.]" While this officer was speaking with the Defendant, the Defendant stated, "I hate that it happened. He just started coming towards me, and I just shot in the ground, I didn't know what to do. I didn't want to shoot him. . . . I just didn't like someone walking on my private property."

The adult victim testified that, at the time of this confrontation, he had lived with his parents for thirty-one years in their house on Buggy Road, just off Boatmans Ridge

Road.  He was five feet, eleven inches tall and weighed around 195 pounds.  According to the adult victim, he had walked around Boatmans Mountain over the years, and he had never "had any issues" walking on other people's property.  He stated that he took regular afternoon walks with his ten-year-old sister, the minor victim, because "[i]t was her favorite thing to do[.]"

The adult victim explained that, while walking through this area, he had regularly cut through an open gate on the Aileys' property using their driveway to reach another residence.  According to the adult victim, this gate was an approximate fifteen-minute walk from his home.  The adult victim stated that he had worked "plenty of times" for the Coffmans who lived in the residence past the Aileys' home.  He claimed that he was not aware of any other way to get to the Coffmans' residence.  When asked if he was aware that the driveway was private property, the adult victim replied, "I thought it was a right-of-way road out there.  And I have walked out there and rode bicycles out there for thirty plus years."  The adult victim indicated that he never saw a "no trespassing" sign posted at the gate.  The adult victim further maintained that he had seen garbage trucks drive down the road, so he assumed that the driveway was an access road open to the public.  The adult victim explained that his family had to move their garbage cans to the end of their driveway because the collection trucks would not drive down the driveway.

On August 21, 2014, he and his sister went for a walk.  Because the temperature outside was around ninety degrees, the adult victim carried "a kid's backpack" on his shoulders that was full of bottles of water, granola bars, and some Yoo-hoos.  He described the backpack as "a two-shoulder backpack" that was approximately ten to twelve inches in length and similar to a book bag in which someone would put books and carry to school.  He asserted that it was not a "duffel bag[.]"

According to the adult victim, he and his sister had passed the Aileys' gate and were walking along the roadway when some dogs, which appeared to be Labrador Retrievers, came "running" at them from the direction of the Aileys' house.  The adult victim stated that the minor victim was "very scared and started crying" because "she thought the dogs were going to eat her up."  The adult victim tried to reassure his sister that the dogs would not harm her, so he went towards them to try to pet them.  The adult victim knelt down "where the pavement stopped" and tried to call the dogs over to them.  The adult victim relayed that Mrs. Ailey emerged at that time.  The adult victim asserted that he had the backpack on his shoulders when they encountered Mrs. Ailey.

According to the adult victim, as Mrs. Ailey started to walk towards them, she was "hysterical" and yelled, "[Y]ou are on private property, leave, get out of here, get off my property, you are not supposed to be here."  The adult victim provided Mrs. Ailey with his father's name and told her that he had lived nearby for thirty years and that he and his sister were "just walking."  The adult victim maintained that he "tried to talk" to Mrs.

Ailey, "but she wasn't having it." She insisted that they leave immediately, so he and his sister "turned around" and started back the way they came. The adult victim testified that, while he and his sister continued to retreat, Mrs. Ailey followed them, repeatedly telling them that they were on private property and needed to leave. The adult victim retorted to Mrs. Ailey that "she didn't have to be mean about it and be a b---h about it." According to the adult victim, it took them "maybe thirty seconds" before they started to leave the Aileys' property, and they began walking back towards the gate as soon as Mrs. Ailey told them to leave.

The adult victim testified that, when he and his sister got "out on top of Boatmans Ridge there right past the gates," they heard a vehicle approaching rapidly. This frightened the minor victim, and because she became "hysterical[,]" she urged her brother to hide with her in some nearby bushes. He explained to her that there was no reason to hide. However, she was crying, so he relented and hid behind a tree with her. From his vantage point, the adult victim saw the Defendant speed by in a white pickup truck. According to the adult victim, once the Defendant was out of sight, the victims resumed walking.

When the victims got close to the residence of Timmy and Misty Loven, which was on the right-hand side of Boatmans Ridge, the victims intended to veer from the road and cut through a field on the left-hand side to go home. However, the adult victim then noticed the Defendant's truck stopped in the road approximately 500 to 600 yards away. According to the adult victim, they were "just right off the road" maybe ten to twenty feet when the Defendant sped towards them. He recognized the Defendant and told his sister that the Defendant "probably want[ed] to talk to [them]." When asked what he thought the Defendant wanted to talk about, the adult victim responded that he believed the Defendant would say not to walk on his property or talk to the Defendant's wife.

The adult victim stated that the Defendant stopped abruptly as he neared them. The adult victim maintained that he put down the backpack he was carrying and placed his shirt, which he had been carrying over his shoulder, on top of it. He then pulled his sister close to him. When the Defendant exited the truck, he was brandishing a firearm and was "[v]ery angry." According to the adult victim, the Defendant announced, "I'm going to kill you[,]" and fired his weapon towards the victims, "blowing dirt all over" them. The Defendant said that he was going to kill the adult victim for speaking with the Defendant's wife. The adult victim raised his hands in the air and pleaded, "Hey look, I've got a kid here[,]" to which the Defendant replied, "I don't give a damn. You talked to my wife." The adult victim told the Defendant, "Look, I don't want no [sic] trouble[,]" but the Defendant fired the gun twice more, saying each time, "I'm going to kill you." The adult victim said that he sent the minor victim home after the third shot, instructing her to "run home and don't look back." The minor victim complied. The adult victim

-4-

explained that he "thought [he] was going to die that day"; that he "was in fear of [his] life"; and that, following the third shot, "[he] threw [his] hands in front of [his] face because [he] knew it was it[.]" After the Defendant fired at him a fourth time, the Defendant got inside his truck, according to the adult victim. When the adult victim asked the Defendant to identify himself, the Defendant provided his name and said, "[Y]ou know who I am." After the Defendant drove away, the adult victim phoned 911.

The adult victim testified that he saw Mr. Loven out there that day. According to the adult victim, Mr. Loven was standing in his yard on the other side of his pickup truck and was watching the events unfold. The adult victim described that Mr. Loven's house was "right across from where [the Defendant] was parked."

The adult victim testified that the Defendant only got out of his truck once, having his weapon in hand at that time, and that the Defendant never returned to the truck before getting inside and leaving. The adult victim also maintained that he did not walk towards the Defendant, other than possibly taking one step, because he "froze" when he saw the gun. According to the adult victim, the Defendant never asked to see his hands. Moreover, the adult victim asserted that he was not in possession of a weapon during this encounter with the Defendant and that he had nothing in his hands. The adult victim also averred that he did not throw rocks at Mrs. Ailey.

When asked how he had been affected by this incident, the adult victim responded, "It's affected me pretty bad. I have missed work over it. I actually lost my job, the job I had for three years. I had to take antidepressants, anxiety medication. It has affected me pretty bad, and my family, especially [the minor victim]." The victims, along with their parents, had filed a civil lawsuit against the Defendant seeking $500,000.

On cross-examination, the adult victim was asked,

Q. But you are a convicted felon, are you not?
A. No, I'm not.
Q. You don't have—
A. I have got a clean record.
Q. I apologize.
A. Thank you.

The adult victim claimed that his medical records would confirm the shooting's impact on him, but he had not provided those to the State. However, he clarified that the State had never requested those. The adult victim's preliminary hearing testimony was read into the record and evinced some minor discrepancies, such as when the adult victim told the minor victim to run home, their distance off the road was thirty feet when the Defendant sped towards them, and the Defendant fired at him "bam, bam, bam."

The minor victim also testified at the Defendant's trial and relayed a similar version of the events as her brother. She testified that she "was stressing out" that day, so she wanted her brother to take her for a walk to calm her down. According to the minor victim, whenever she and her brother went for a long walk, they "would always go through" the Aileys' gate. She also did not see any "no trespassing" sign posted and believed it was a public road.

After passing through the gate, she and her brother encountered the Aileys' dogs, which scared her because they were "really muscular" and barking. The minor victim said that her family had a Labrador Retriever that had recently passed away and that she wanted to pet the dogs "to get over her fear of them[.]" She and her brother had gone "over to the rocks" to try and pet the dogs when Mrs. Ailey came outside. According to the minor victim, Mrs. Ailey started yelling at them "saying that they had an electric fence" and that she and her brother needed to leave. Mrs. Ailey was swearing, so they turned around and started back towards the gate. Her brother said to Mrs. Ailey that "she didn't have to be a b---h about it[,]" but that was all he said, according to the minor victim. She further averred that her brother did not throw anything at Mrs. Ailey that day and described her brother as "a very nice person."

The minor victim said that the entire conversation between her brother and Mrs. Ailey was brief and that Mrs. Ailey was on the phone when they started to leave. The minor victim maintained that, as they were walking back down the driveway, she started "freaking out," believing that Mrs. Ailey was calling the police. The minor victim explained that she "had anxiety at that point" because she "had a lot happen in [her] life up to that point[.]" She and her brother went "off the roadway" and sat down because she was having a panic attack, which, she relayed, was only her second ever attack. A white truck "flew past," according to the victim. The minor victim said that, about two minutes after the truck had passed them, she and her brother got up and proceeded to start walking back home. The minor victim testified that, while she and her brother were subsequently speaking with their mother by telephone, their mother "was talking about how the white truck sped down the road and backed up in [their] driveway and stuff[,]" so the minor victim "didn't know what to think at that point."

When they reached their aunt and uncle's field, she and her brother decided to cut through the field to get to their house. The minor victim described that, at that point, the Defendant "sped up and he stopped his truck right in front of [them.]" She maintained that the Defendant "jump[ed] out" of the truck with a gun and pointed it at their heads; that the Defendant "start[ed] saying that he [was] going to kill [them] and he started cussing [her brother.]" She expressed that "[d]irt was splattered all over [them]" from the shots that the Defendant fired and that the Defendant "said I'm going to kill you about four times." According to the minor victim, "by the third shot," her brother said, "I have

a little girl here and [the Defendant was] like I don't give a damn." She then reluctantly ran home in accordance with her brother's instruction. She believed "that was the last time [she] was going to see [her] brother alive."

The minor victim testified that her brother's hands were empty during the altercation and that her brother "was not angry at all[,]" but instead "was in pure shock." She said that the Defendant appeared "[a]ngry" and "fuming" and that he was not acting like "a normal person would[.]" The minor victim averred that she "thought [she] was about to die." When asked how she had been affected by this incident, the minor victim responded,

> I'm twelve years old, I'm on antidepressants, I have to take a twenty milligram of an antidepressant a day and if I don't, I start having panic attacks. Anytime I hear a loud noise, I lose it, I completely lose control, I fall down crying. Like one time I was at a bible school and all of a sudden a loud pow happened, I couldn't stand up, I couldn't do anything. I have panic attacks like not monthly now or weekly.

She further relayed that she still lived on Boatmans Ridge Road and that, "every time [she went] to school or c[a]me home from school," she "still ha[d] to see the spot."

The victims' mother ("Donna")[1] testified that they were grilling hamburgers on the evening of August 21, 2014, and that the burgers were almost ready, so she called her son to see how far he and his sister were from home. When Donna spoke with her son, she could hear the minor victim "crying in the background." Donna asked what was wrong, and her son told her that they were "hiding in the woods." Donna replied, "Whatever is going on, . . . get home." Shortly thereafter, Donna, who was out on the deck, saw "a white truck go out [Buggy R]oad really fast." A few minutes later, Donna saw "the white truck c[o]me flying down [their] driveway almost to the house," and then, it "backed up real fast in reverse" and headed "out [of] the driveway." Donna watched as the truck stopped at another neighbor's house. According to Donna, that neighbor, Joe Whiteside, was working on his lawn mower. Donna estimated that the Defendant only stopped at Mr. Whiteside's for "three to five seconds."

Donna stated that, when she spotted her children "up on the road," she saw the white truck, almost simultaneously, speed up "really fast" in their direction. Knowing that "something [was] not right," Donna got the attention of her husband and they "took off running." As they were "over halfway up the hill," the Defendant stopped his truck near the children, "jumped out" with "something shiny" in his hand, and ran "around the

---

[1] It is the policy of this court to protect the identity of minor victims. In furtherance of that policy, we will use the first names of the minor victim's family members. We intend no disrespect in doing so.

back of [the truck] yelling 'I'm going to kill you.'" Donna said that she heard the Defendant say this three times.

Donna testified that she started to wave her arms, jump up and down, and repeatedly scream at the Defendant, "[P]lease don't kill my kids." According to Donna, her daughter and son "were standing side by side" when she "started hearing the gunshots going off." Donna described that she heard one gunshot and then another and that, after those shots, she heard her son urging his sister to run home and not "to look back." Donna stated that her daughter "turned around . . . and was crying and screaming" as she came running down the hill. Donna said that her daughter ran past her into the house and that her daughter appeared to be "totally in shock[.]" When Donna followed her daughter inside, she watched her daughter run in circles before shouting out, "I know he's killed him, . . . he has shot my brother, he has killed my brother, he's dead, I know he's dead." When Donna tried to go after her daughter who had run out the front door, Donna "just fell down in the floor" crying because she believed her son was dead.

According to Donna, the Defendant never went back to the truck after exiting it; her son did not have anything in his hands during the incident; and her son did not "approach [the Defendant] in an aggressive way[.]" Donna also saw her son's bag "on the ground" a short distance away from where her son was standing, but she said that her son never attempted to go back towards the bag.

The victims' father ("Tom") also testified, relaying a similar version of the events as his wife. Tom said the he was on the deck cooking when his wife came and told him that their children were hiding in the bushes and that the Defendant "was chasing them in his truck." Just then, Tom saw the Defendant "coming down" their "gravel right-of-way road almost to [their] house." Tom began "throwing [his] hands up" in the air and walking towards the road to speak with the Defendant. According to Tom, the Defendant turned his truck around and "burned out."

Tom went into the field and saw his children "at the top of the road" and hollered at them that they needed to "hurry up" and "get down" to the house because "something [was] wrong with" the Defendant. Donna moved in behind Tom at that time. Tom saw the Defendant stop at Mr. Whiteside's house before the Defendant "floor[ed] it" towards the children. According to Tom, the Defendant jumped out of his truck with a gun in his hand and screamed, "I'm going to kill you[.]" Tom described that the Defendant pointed the gun at the victims who were side by side and shot "one time, two time[s], three time[s], repeatedly hollering I'm going to kill you"; that his son told the minor victim to run; that the Defendant shot again and "dirt flew on her and everything"; and that the minor victim ran down the hill "just hysterical." Tom also heard his son "holler[] out can't you see there's a kid here[,]" and the Defendant reply, "I don't give a damn." The

Defendant then got in his truck and left the scene. Tom did not initially know if his son had been hit by a bullet. When the altercation was over, Tom called 911.

Tom explained that his son "had some kind of little kiddy backpack" in his possession during the encounter, which his son dropped on the ground when the Defendant "flew to come down there[.]" Tom claimed that his son never went back to the backpack. According to Tom, his son was just standing there and never approached the Defendant aggressively, but the Defendant "was totally out of control and angry[.]" Tom thought that "[his] kids were gone." When asked if the minor victim was "having issues" from these events, Tom responded,

> Sh[e] has big issues. She can't play on her swing set, she has had trouble sleeping at night. The Aileys [have gone] home before, she has run, fell down on the back deck thinking they were going to come down the driveway. I have to drive her fifty-five miles on the other side of Knoxville for therapy, she is on medication. She is in real bad shape and she has anxiety.

On cross-examination, Tom was asked about his 911 call. Tom said he informed the operator that the Defendant "ha[d] just shot at [his] kids" and that they "need[ed] to get out [t]here or something like that." Tom was asked if he recalled telling the 911 operator that the gunshots "might [have] been fireworks[,]" and Tom replied in the negative. Questioning about the 911 call continued:

> Q. So if the jury were to hear a 911 call with you on it in your voice saying you don't know what happened, there may be fireworks somebody being fired [sic], that you are not sure what is going on and you didn't see where [the Defendant] went, that would be a lie, wouldn't it? Or you would be lying now. One of them has to be a lie, correct?
> A. Repeat your question.
> Q. If the jury heard a 911 call—what did you tell the 911 operator?
> A. To the best of my memory, [the Defendant] just shot at my kids, . . . you all need to get out here.
> Q. Are you aware of anybody telling them—do you remember anybody telling them that it might have been fireworks?
> A. Not to my knowledge.
> . . . .
> Q. Would it be accurate on your first impression talking to law enforcement saying I don't know what happened, I wasn't around, when you talked to them?
> A. I don't know what happened, I wasn't around?
> Q. Yes.

A. No, I didn't say that.
Q. That wouldn't [be] true?
A. Not unless they were talking about when they were out on his right-of-way road.
Q. No, in talking about the shots being fired and why and what happened when they were fired. You don't recall saying I don't know what happened, I wasn't around?
A. No, I don't.

On redirect examination, Tom clarified that he was "not the caller on 911 from 1736 Boatmans Ridge who talked about firecrackers[,]" noting that was not his address.

The sound of gunshots drew the attention of Timmy and Misty Loven, who lived nearby. Mrs. Loven testified that, on the day in question, she was sitting in her living room watching television while her husband and stepson were working "out back" on a car. Mrs. Loven went "to see what they were doing" and saw "a white truck the next driveway up pull in but it backed out[.]" She described that it "went up the hill because it's like a private drive, and then that truck went down that private driveway and it made an immediate right going out toward, back out toward . . . [the] road like going out." Mrs. Loven went back inside. "[A] few minutes later," Mrs. Loven looked outside and observed that same white truck at the victims' home, and she maintained that it was "just sit[ting] there" before backing up "like normal."

A few more minutes passed before Mrs. Loven heard a gunshot and then another, which she believed were "awful close" to her home. Mrs. Loven looked out her window and saw the white truck and the victims "in the field" nearby. The next thing she observed was the minor victim running towards her parents, and Mrs. Loven began "getting really concerned." She then heard a third shot and went outside. According to Mrs. Loven, the Defendant and the adult victim were arguing, but she could not really hear what they were saying. The Defendant then fired a fourth shot towards the adult victim, who Mrs. Loven noticed was not wearing a shirt and was "patting" his skin as if he believed he had been shot. Mrs. Loven then watched the Defendant get back in his truck and "spin[] off." Mrs. Loven never saw the adult victim with anything in his hands, and it was only after the altercation was over that she saw the backpack lying on the ground beside a tree.

Mrs. Loven testified that she ran to the adult victim, who was on the phone with 911. While the adult victim was on the phone, he asked her if she would "be a witness," and she agreed.

Mr. Loven also testified at trial. Mr. Loven conveyed that he was working on his daughter's car "in the driveway behind [his] house" when he observed a white truck pull

up the "driveway right behind [his.]" He heard someone in the truck say, "[O]h, hell that's not them," before the truck backed out of the driveway and proceeded to leave. Mr. Loven continued working on his daughter's car and later heard a gunshot. When he heard a second shot that "seemed closer[,]" he looked up and walked forward "out of curiosity." He saw the same white truck that he had seen earlier "s[i]tting in the road and there [were] two men arguing." Mr. Loven described his vantage point as "diagonal towards where [the] truck was s[i]tting and where they were" arguing. He affirmed that he had "a clear visual."

Mr. Loven said that he heard a scream and saw the minor victim "running down the hill" saying "he's going to kill my brother, he's going to kill my brother." According to Mr. Loven, the men "continued to argue," and the Defendant shot again. The Defendant "act[ed] like he [was] going to get in this truck," but "he [went] back" and shot a fourth time. When the Defendant was leaving, Mr. Loven heard the adult victim ask "who are you anyway," to which the Defendant responded with his name and said "you know who I am."

According to Mr. Loven, the adult victim did not have anything in his hands during the altercation; the adult victim never approached the Defendant aggressively; and the adult victim seemed "scared." Mr. Loven testified that he did not hear the shots as going "bam, bam, bam."

Detective Statler Collins with the Hamblen County Sheriff's Department responded to the 911 calls. After speaking with both victims, Detective Collins and two patrol officers drove to the Defendant's house where they were met by the Defendant and his wife in the driveway. The Defendant asked, "Can I give my side of the story?" After being Mirandized, the Defendant gave the following statement:

> [The Defendant] stated that the victims . . . came on his property and got into a verbal altercation with Mrs. Ailey. [The Defendant] stated that [the adult victim] called his wife a b---h and they did leave the property. He said that he did get into his truck and go after them. He did drive up and down the road a couple times looking for them. He did see them and he stated that the boy put down a backpack and told the girl to go home. He then stated that he pulled up next to him and got out with his gun to his side. They got into a verbal argument and [the Defendant] said that the boy had his hand in the backpack and that is when he fired a round beside of him. He said that the boy continued to walk toward him and fired three more rounds in the ground beside him.

Detective Collins returned to the victims' house and asked the adult victim about the backpack. According to Detective Collins, the adult victim indicated that he put the

backpack down and that nothing was in his hands when the Defendant fired at him. Detective Collins then returned to the Defendant's house and arrested him.

Both the Defendant and his wife, a Morristown school teacher of twenty-two years, testified at trial. Mrs. Ailey stated that, on August 21, 2014, she spotted a stranger "crouched down in [her] yard" with a little girl at his side. Her dogs "were going nuts," barking and jumping, because "someone strange was in her yard." Mrs. Ailey stated that the stranger was trying to "bait" the dogs by "making gestures to them" and calling them saying that he had "something" for them. Mrs. Ailey told the stranger that the dogs could not reach him because of an electric fence that limited how far they could roam. She also "asked him what he was doing on [her] property, did he not see the no trespassing signs." According to Mrs. Ailey, the stranger did not say much in response to her but kept calling her dogs. She testified that she asked the man to leave, but he did not go immediately. When she asked the stranger again to leave, he stood up and "took about six steps" to proceed back towards the gate, but he stopped. Mrs. Ailey requested that he leave once more, to which the stranger replied, "You f--king b---h," and gave "[her] the finger." Mrs. Ailey said that the little girl started "screaming and crying at him." The stranger and the girl then "meandered down the road," eventually disappearing off of her property. According to Mrs. Ailey, it took about eight to ten minutes for them to leave.

Mrs. Ailey asserted that the stranger had a "long bag on his shoulder" and that he kept his hand in it throughout the time he was in her yard. According to Mrs. Ailey, the bag was not a backpack, and it "looked like a long weapon's bag." She maintained that she felt "very threatened" for her safety and her dogs because she believed that the stranger had a weapon in his bag and because she lived in a remote area with posted no trespassing signs. Mrs. Ailey described the man as "very, very scary," "very off balance," and "very erratic." When asked to identify how the man's appearance was scary, Mrs. Ailey described him as "very sloppy[,]" but she clarified that it was "the way he was acting" that "really was the scary part." Mrs. Ailey also asserted that the man's speech was "mumbled" and incoherent, possibly evidencing "a drug problem or something."

After the stranger left, Mrs. Ailey went inside and relayed the events to her husband. According to Mrs. Ailey, the Defendant could see that she "was terrified" by the recent incident. Mrs. Ailey confirmed that the Defendant then got in his truck and left their house. When asked if her husband was angry when he left, Mrs. Ailey, replied, "Well, he wanted to see who was in our yard, yes . . . ." Mrs. Ailey did not immediately call 911.

Mrs. Ailey confirmed that she phoned 911 when her husband returned home following the confrontation, and she knew that "warning shots" had been fired at that time. She explained that she did not call 911 right after the Defendant's return but

-12-

"waited for a few minutes" because she "was so distraught and so upset" that she "wanted to calm down a little bit" before placing the call.

Mrs. Ailey testified that she had lived at her home for twenty-four years. According to Mrs. Ailey, they had been leaving the gate to their property open for approximately one year prior to this incident at the request of their next-door neighbors. She asserted that she had never seen this man walking down her driveway before and, in fact, had "never seen a stranger in [her] yard" period. When asked whether she was familiar with the victims or their parents, Mrs. Ailey replied, "No, I had never heard of those people or seen any of those people." She further maintained that the adult victim had never requested permission to be on her property.

The sixty-year-old Defendant testified that he worked at Burke-Ailey Construction and that he had lived at his current residence for twenty-four years. He maintained that a no trespassing sign was posted at his gate on August 21, 2014. The Defendant averred that, although the gate was open that day, it "was normally closed at that time." According to the Defendant, it was not common for people to walk down his driveway and that, in his twenty-four years of living on the property, he had never seen the adult victim doing so.

The Defendant stated that, after his wife came inside and told him about the encounter, he left in his truck to find the person who his wife claimed had threatened her and their dogs. The Defendant indicated that he believed the man was possibly armed because the man was not scared of calling their two large dogs. Also, the Defendant's wife instructed the Defendant to "be careful" as he was leaving because the man could be armed. The Defendant asserted that he was a "card carrying permit" holder and that he kept a .380 in his truck's door. According to the Defendant, his intentions in leaving were to "go try to find out who had come on [his] property and threatened [his] wife and [his] dogs, try to talk to them." He claimed he "wasn't looking for a confrontation" that he "just wanted to find out who it was and ask them not to come back."

The Defendant said that he left his house and drove past his gate onto Boatmans Ridge Road, driving until he reached Buggy Road, where he "back[ed] down and turned around." While proceeding back towards his home, the Defendant pulled into the driveway behind the Lovens' home, but he left when he did not see anyone there. When he pulled out of that driveway, rather than continue home, the Defendant again drove towards Buggy Road and "back down it again." Once back on Boatmans Ridge Road driving in the direction of his home, the Defendant saw that Joe Whiteside's mower "had stopped and it was on a slope, pretty steep bank." The Defendant asked Mr. Whiteside if he "need[ed] some help moving [his] lawn mower" because it was getting dark, but Mr. Whiteside said no that he would wait until the next day to move it. When Mr. Whiteside inquired what the Defendant was doing, the Defendant "explained to him that [he] was

looking for someone that had threatened [his wife] and the dogs." The Defendant indicated that, at no time, was he driving erratically, making loud noises with his vehicle, or "spin[ning]" his tires. The Defendant also averred that he did not "go down to" the victims' home and that he did not "go all the way up" the driveway behind the Lovens' house.

According to the Defendant, while he "was sitting there talking to" Mr. Whiteside, he saw the victims crossing the road ahead and said "that may be them" and that he was "going to go talk to them." The Defendant claimed that he "eased off the hill and drove down and stopped[,]" never speeding or spinning his tires as he approached the victims. The Defendant maintained that the adult victim "laid his shoulder bag down on the ground" and walked "the little girl down to the corner of the [Coxes'] house out of the way." The Defendant claimed that, after he stopped his truck, the adult victim started walking back towards him and "pick[ed] the bag up, not all the way off the ground but just reach[ed] down in the bag and then la[id] it back down." The Defendant claimed that he did not initially have his gun when he got out of his truck but retrieved it when the adult victim reached into the bag, believing that the adult victim may have gotten a weapon out of the bag. The Defendant alleged that he "chamber[ed] a round" but held the gun at his side as he walked around his truck to address the adult victim. The Defendant "asked him who are you, what's your name, why did you . . . come on my property and threaten my family." When the adult victim refused to answer the Defendant's questions or show his hands, the Defendant fired two, successive warning shots "in the dirt" towards a nearby field. The Defendant explained,

> So I fired two warning shots way to the left because . . . I didn't want a ricochet. Where we were standing was elevated, had this slope and it was, you know, a perfect ricochet situation. So I didn't want to fire at anybody or hit a building or whatever so I fired into the field and the wood line, I fired two shots.

The Defendant testified that, despite the warning shots, the adult victim did not "bat an eye" and continued approaching him. The Defendant requested that the adult victim stop, but when he did not comply and still would not show his hands, the Defendant fired two more shots. The Defendant said that he had one more round in the chamber, which he did not want to fire because he needed it to protect himself. According to the Defendant, after he fired the last two warning shots, the adult victim pulled out a phone, held it up, grinned, and said, "I've got you now." The Defendant warned the adult victim not to return to his property and left.

The Defendant averred that the adult victim was about eight yards away when the Defendant fired the first two warning shots; that the adult victim was "getting pretty close" when the Defendant fired the second two shots; that he never told the adult victim

-14-

that he was going to kill him; that, if he intended on shooting the adult victim, he would not have "missed four shots"; and that he never pointed the gun at the adult victim's face. The Defendant asserted that, while he "was upset that someone came in and threatened [his] family," he was not "in a rage" as they claimed. The Defendant speculated, "[Y]ou know, if I was in a rage, why would I stop and ask somebody if they needed help with their lawn mower. . . . I was just trying to find out who he was and what he was doing there." According to the Defendant, he had no "other option at that point" but to shoot, and he was only trying to protect himself.

On cross-examination, the Defendant explained that he did not see the minor victim again after the adult victim "walked her down to the corner of the house[.]" The following dialogue then took place:

Q. So the people that say they saw her running are not telling the truth?
A. They are lying.
Q. And [the minor victim] is lying?
A. Yes, ma'am.

The Defendant confirmed that, although the adult victim would not show him his right hand, he never saw the adult victim in possession of a weapon that evening. The Defendant averred that he did "have a right" to ask the adult victim to show him his hands due to the adult victim's actions that evening. Also, when confronted with the statement he gave to Detective Collins, the Defendant said that Detective Collins must not have understood him because he did not get out of his truck with his gun in hand. When asked why he did not call 911 before he went looking for the victims, the Defendant explained that it would have taken "a while for them to get up there" and that he "tr[ied] to protect his family."

2. Sentencing Hearing. The Defendant submitted an application for judicial diversion. Attached to his application were multiple support letters written on his behalf, which included letters from the Defendant's neighbors Eddie Cox and Donna Coffman, letters from community and family members, a letter from the Defendant's business partner, and a letter from the Defendant's pastor. It was expressed in several of the letters that the Defendant had indicated his remorse.

The application also contained affidavits from several neighbors, Joe Whiteside and Sandra and Eddie Cox. In the affidavit, Mr. Whiteside stated that the Defendant "did not drive at a high rate of speed down the road" and that he did not hear anything like the Defendant's slamming on his brakes when the Defendant stopped his truck. Mr. Whiteside also relayed that he saw the adult victim walking towards the Defendant and heard someone say something to the effect of, "Who are you calling a boy." Mr. Whiteside stated that he never saw the minor victim while the Defendant was shooting,

that he did not hear the Defendant threaten to kill anyone, and that he did not see the Defendant point the gun at the adult victim. Mrs. Cox, who lived very close to where the incident occurred, stated in her affidavit that she did not hear any vehicle making loud noises in the neighborhood prior to her hearing the gunshots. She also averred that she did not hear anyone yelling or screaming or threatening to kill anyone. Mr. Cox stated in his affidavit that he returned home after the shooting but before law enforcement arrived. According to Mr. Cox, he found "two places in the field close together where the ground was disturbed and that appeared to be where bullets might have hit," and ultimately, he and the officers "dug up two bullets."

In addition, attached by the Defendant to his application for diversion was a deposition given by the Defendant in the civil proceeding. In the deposition, the Defendant denied responsibility for firing a weapon at the victims and insisted that both victims, their parents, and Mr. and Mrs. Loven had lied about the offenses.

The presentence report, included in the technical record on appeal, was apparently submitted to the trial court before the sentencing hearing. It indicated that the Defendant had no prior criminal history, that the Defendant was a college graduate, that the Defendant owned Burke-Ailey construction with a business partner since 1986, that the Defendant's yearly income was approximately $65,000, that he had been married for thirty-four years, and that he had two sons. According to the Defendant, he coached his sons' ball teams when they were teenagers, and he had funded their college educations. He also relayed that he served on the Board for the Morristown Chamber of Commerce and the Knoxville Association of Building Contractors. The Defendant reported his mental health as "excellent." The Defendant denied using illegal drugs or abusing alcohol but conceded that he smoked marijuana in college. He said that he attended church regularly. The Defendant reported that he took prescribed medication for his allergy, cholesterol, and acid-reflux problems, as well as an anti-inflammatory drug.

Several victim impact statements were contained in the presentence report. The adult victim said that he and his family had "faced physical, mental, and financial hardships." The adult victim reported "[e]ndless hospital and doctor visits for [his] hypertension, therapy visits, and adjusting medications" due to these events, which had resulted in unpaid medical bills. He further relayed that he lost "a great job of three years due to absences for medical, therapy, depositions and court." The adult victim maintained that the Defendant "should do jail time just like anyone else."

The minor victim noted that she was ten years old at the time of this encounter and averred that, prior to these events, she "had no fear in [her] life." She stated that now she was afraid every time she saw the Defendant or his wife "drive in front of [her] house" because she was "terrified [they were] coming to kill [her] and [her] brother."

-16-

The victims' parents also provided victim impact statements. They described the minor victim's behavior when she saw the Defendant's truck pass by their house. They said that the minor victim suffered from nightmares and from "uncontrollable anxiety" that required medication. According to the victims' parents, their daughter was now scared by loud noises and had to be taken to therapy in Knoxville every three weeks, which was a financial hardship because it was fifty-five miles one way. They averred that their daughter's "personality ha[d] changed a lot." The victims' parents relayed that the family could no longer take walks around the neighborhood and that they locked their doors after this incident. As for their son, the adult victim, they maintained that he had been "suffering from a lot of the same symptoms" as the minor victim experienced. The victims' mother indicated that, due to this incident, she took "medication for anxiety [and] nerves, stress." The victims' father stated that he carried a gun at all times at present because things were "very stressful now on the mountain." The victims' parents prayed, "[N]o he should not be released on parole supervision, he has showed no remorse for the crime he did. He lied about everything and called us liars."

Both victims gave brief victim impact testimony at the April 28, 2017 sentencing hearing. They described the depression and anxiety they dealt with in the aftermath of this encounter. The Defendant sought to question the victims, but the trial court did not allow it. The Defendant's attorney asked to submit the questions he would have asked the victims had he been allowed to question them, and the court agreed. As pertaining to the issue of the victims' mental health, defense counsel wanted to ask the victims to describe their medical treatment and explore whether the Defendant's "conduct was the proximate cause of the need for treatment." The Defendant's lawyer also wanted to inquire "about the status of the civil claims," "confirm that there [had] been no confrontations with [the Defendant] in the [two and one-half] years since the incident," ask the adult victim about his working relationship with the Defendant's next-door neighbors the Coffmans, about the veracity of several of the individuals who provided support letters and affidavits for the Defendant, and whether there was a familial relationship between the victims and any law enforcement officer that was involved in the investigation.

At the conclusion of the hearing, the trial court evaluated the evidence presented by the parties. The trial court found the civil deposition particularly important, reading a large portion of it into the record. Initially, the trial court denied the Defendant's request for judicial diversion. Thereafter, the trial court set the length of the Defendant's sentences at four and one-half years, found that consecutive sentencing was not appropriate, and declined to grant full probation and instead ordered that the Defendant serve six months' confinement.

3. <u>Motion for New Trial Hearing</u>.  The Defendant filed a timely motion for new trial.  In the motion, the Defendant averred that "false statements" had been made "by prosecution witnesses."  Specifically, he argued that the adult victim had "falsely testified [at trial] that he had a clean record[,]" noting that the adult victim had misdemeanor convictions in 2000 in North Carolina for possession of marijuana and drug paraphernalia and in 2002 in Tennessee for reckless driving.  The Defendant submitted that, "[a]lthough [the adult victim's] convictions might not have been admissible for impeachment under Rule 609 of the Tennessee Rules of Evidence, the witness had no right to testify falsely regarding his record."  Next, the Defendant contended that the victims' father testified falsely "under oath that he had witnessed [the Defendant] commit the acts in question," citing to the statements the victims' father made in the 911 call and the time that the call was placed.

The Defendant then raised the issue of ineffective assistance of counsel.[2]  The Defendant alleged that trial counsel rendered ineffective assistance in the following ways: (1) Trial counsel did not adequately advise the Defendant of the State's plea offer of full probation or of the consequences of not accepting it; (2) Trial counsel failed to conduct an adequate, thorough pretrial investigation into the facts and circumstances of the case; (3) Trial counsel failed to interview Mr. Whiteside who would have supported the Defendant's version of events; (4) Trial counsel failed to subpoena Sandra Cox to testify at trial who would have contradicted the statements made by the State's witnesses about the Defendant's behavior; (5) Trial counsel failed to interview Eddie Cox who helped the officers locate two bullet casings; (6) Trial counsel failed to request an instruction on the lesser-included offense of reckless aggravated assault—"an offense that would have fit the allegations more closely, even if self-defense were rejected"; (7) Trial counsel failed to impeach the victims' father with "his prior [911] statement that undermined his trial testimony," but rather, "trial counsel mistakenly attempted to impeach the witness with 911 statements that were made by someone else and this cross-examination in effect supported the State's case"; (8) Trial counsel failed to research the criminal history of the adult victim and "was therefore unable to effectively cross-examine him after the witness's false statement regarding his record"; (9) Trial counsel failed to object to the State's improper cross-examination of the Defendant "in which the prosecutor asked [the Defendant] to comment on the veracity of other witnesses"; and (10) Trial counsel failed to prepare the Defendant to testify, including failing to inform him that it was "always harmful to claim another witness is 'lying' when in fact that calls for speculation."

The Defendant raised several additional issues as well.  The Defendant submitted that "[i]t was plain error for the prosecution to ask [the Defendant] to speculate as to the veracity of other witnesses, including a child witness"; that it was error for the trial court

---

[2] The Defendant had retained new counsel by the time of the sentencing hearing and the motion for new trial hearing.

to fail to include a lesser-included offense instruction of reckless aggravated assault; that the evidence was insufficient; and that cumulative error denied him a fair trial.

At the February 23, 2017 motion for new trial hearing, the Defendant testified that, soon after he was charged with aggravated assault, he hired trial counsel and that he provided trial counsel with "the full version of the events" and with the names of potential witnesses. The Defendant named Mr. Whiteside as a potential witness because the Defendant had interacted with Mr. Whiteside just minutes before confronting the adult victim. The Defendant insisted that he told trial counsel that Mr. Whiteside would be able to testify about the Defendant's demeanor at the time. The Defendant alleged that he "continuously" asked trial counsel to interview Mr. Whiteside during the two years preceding the trial because the Defendant "felt like [Mr. Whiteside] saw it all take place." The Defendant noted that trial counsel was also his attorney in the civil matter concerning this incident and that the victims' lawyer inquired during a January 2016 deposition if anyone from the defense team had interviewed Mr. Whiteside. The Defendant also produced text messages in which he asked counsel to meet with Mr. Whiteside and in which trial counsel indicated that this interview was imminent. According to the Defendant, he had only learned shortly before trial that trial counsel had not spoken with Mr. Whiteside.

The Defendant also claimed that he asked trial counsel to speak with Sandra and Eddie Cox, who he thought were at home when the altercation occurred. According to the Defendant, the Coxes' home was the closest to the scene. The Defendant stated that trial counsel told him that he planned to speak with the couple without the Defendant's being present to encourage them to speak "more freely." The Defendant averred that he had expected Mr. or Mrs. Cox to testify but learned from Mr. Cox at trial that trial counsel had never spoken with them.

The Defendant testified that trial counsel provided him with a copy of discovery, including a disc containing 911 recordings that the Defendant reviewed "multiple times." The Defendant stated that the call from the victims' father was "substantial[ly] differen[t]" in "tone and tenor" from the call placed by the neighbor Rainbow Drinnon that lived at 1736 Boatmans Ridge Road. Because the Defendant believed that the victims' father's testimony was substantially different from his 911 call, he asked trial counsel to play the 911 recording of his call after the victims' father testified. The Defendant further alleged that he tried to correct trial counsel when trial counsel asked the victims' father if he had thought he heard fireworks because it was Mr. Drinnon, not the victims' father, who mentioned fireworks in his 911 call. According to the Defendant, trial counsel ignored his requests in this matter. In addition, the Defendant maintained that he did not see the victims' father at the scene and that he informed trial counsel of this detail.

The Defendant averred that he wanted to resolve the case through a plea agreement that included diversion. The Defendant insisted that he told trial counsel repeatedly that he did not want to go to trial. The Defendant said that he wanted to avoid a trial for two reasons. He described his primary motivation for avoiding a trial as follows: "I fired the shots, and you know, I did it for what I thought I needed to protect myself. But I didn't fire at anyone, but I fired the shots. So . . . if I'm guilty of that and that's assault, then I'm guilty." The Defendant stated that his secondary reason was his desire to protect his family and his business from "the court of public opinion." However, the Defendant acknowledged that trial counsel explained that the prosecutor would not offer him diversion because the victims opposed any such plea agreement.

The Defendant claimed that, absent a plea agreement, he had planned to plead guilty and apply for judicial diversion and appeal if it was denied. According to the Defendant, however, trial counsel discouraged him from entering an open plea. The Defendant acknowledged that he had "heard it's hard to get diversion" but claimed that trial counsel described him as a "perfect candidate."

The Defendant indicated that he met with trial counsel a few weeks before trial and that trial counsel said that the prosecutor wanted to make an offer but that the victims would not agree to one. The Defendant asserted that trial counsel never relayed any offer to him. The Defendant alleged that trial counsel described the case as "a slam-dunk," bragged that the prosecutor had "never beat" him in the courtroom, and insisted that, despite her lack of success against trial counsel, the prosecutor would not prepare for the trial. The Defendant relayed that trial counsel advised him that he could still seek diversion if convicted by a jury and did not tell him that there would "be a worse sentence by not pleading guilty." According to the Defendant, if the prosecutor had offered him a plea agreement that did not include diversion, he would have accepted it "because [he] was guilty of firing the shots, and [he] never denied . . . firing the shots."

The Defendant alleged that trial counsel never discussed the difficulties of a trial involving a young victim and never advised him that most people convicted of aggravated assault with a firearm go to prison. The Defendant insisted that trial counsel did not discuss the potential for a sentence of split confinement or the possibility of a conviction for a lesser-included offense. While trial counsel did explain the ramifications of a criminal conviction, he only did so after recommending going to trial. Furthermore, the Defendant maintained that trial counsel did not advise him of his right to remain silent in the civil case and did not warn him to refrain from answering questions during his deposition that accused other witnesses of lying. According to the Defendant, the day before his trial, trial counsel reviewed the recording of the Defendant's deposition with him, said "that[ was] as good as [trial counsel had] seen [it] done," and encouraged the Defendant "to do the same thing" at trial. The Defendant noted that trial counsel did not

depose the victims or their parents prior to the Defendant's criminal trial. The Defendant was asked to describe any "additional preparation" he did in preparation to testify at trial, and he indicated that he prepared on his own by reviewing "all the information [he] had," such as the police reports and listening to the 911 tapes.

The Defendant then challenged the trial court's conclusion at sentencing that he was "not remorseful." He claimed that he hated that "this incident ever happened" and regretted that he left his property that evening. He denied that he intended to hurt anyone and insisted that he had "fired warning shots away from these individuals." The Defendant averred that he was sorry "if [he had] caused any emotional stress" before asserting, "but . . . my wife and I were also victims here, too[.]" He concluded, "I always said that I was guilty, I fired the shots, and I'll plead guilty. And I've never denied that."

On cross-examination, the Defendant conceded that, during his civil deposition, he denied his guilt and would not "admit that he did anything wrong[.]" He also stated multiple times in the deposition that he wanted to go to trial and did not intend on pleading guilty. However, the Defendant maintained that he said these things on the advice of trial counsel to provide "leverage to work out any kind of offer." The Defendant testified that trial counsel informed him prior to trial that the case hinged on his credibility versus the victims' credibility.

When asked whether he had spoken to Mr. Whiteside "about what he saw" on the day of the offense, the Defendant indicated that Mr. Whiteside "corroborated" his version, describing "[p]retty much the same events that took place that [the Defendant had] explained." When asked how Mr. Whiteside's version corroborated his, the Defendant explained,

> [M]y attitude, I guess, how I was that day. I was claimed to have been screaming, and I was not. I was very calm. He could testify that he never saw me point a gun at anyone and that [the minor victim] was not with [the adult victim] when he was walking towards me. She was nowhere near him.

The Defendant affirmed his belief that Mr. Whiteside "saw what actually took place" and that he believed Mr. Whiteside was willing to testify at trial. On redirect, the Defendant claimed that trial counsel "wouldn't talk with Mr. Whiteside" originally because he said they did not "want a third story."

The parties then agreed to allow testimony from the prosecutor about her role during plea negotiations with the Defendant and to stipulate to its accuracy. The prosecutor informed that she spoke to trial counsel "numerous times about a potential working-out of this case." The prosecutor indicated that the district attorney's office

policy required "a written recommendation from the victim" in support of any plea agreement to a reduced charge or sentence. She stated that, on one occasion, she talked with the victims' father about probation and that he was "okay with probation." She then contacted trial counsel and asked if the Defendant would be willing to accept probation. The prosecutor explained, "I still had one victim, [the adult victim], out there that I had not talked to. But I did not want to fire him up and get him all bent out of shape if [the Defendant] was not willing to take probation." Trial counsel spoke with the Defendant and told the prosecutor, "We'll just go to trial. He does not want to take that." The prosecutor indicated that "was the last negotiation that [they] had."

Trial counsel testified that he began practicing law in 1999 and represented the Defendant through general sessions court and up until the sentencing hearing. Trial counsel relayed that, when he was first retained, he spoke with the Defendant about the facts of the case. According to trial counsel, the Defendant was upset that the police had not interviewed him, and the Defendant mentioned that they also did not interview Mr. Whiteside.

Trial counsel said that he received discovery after the indictment was issued and that the 911 recordings were included therein. Trial counsel provided the Defendant with a copy of all the discovery materials. Trial counsel testified that he listened to the 911 calls but did not have a transcript of the calls prepared. He agreed that the trial testimony of the victims' father "var[ied] quite a bit from what he said on the 911 call[]" and that he intended to impeach the victims' father with those discrepancies. Trial counsel acknowledged that, when cross-examining the victims' father about the matter, trial counsel asked the victims' father whether he had initially told the 911 operator that he thought it might have been fireworks. According to trial counsel, the Defendant passed him a note at trial reminding him that it was another caller, not the victims' father, who had mentioned fireworks in his call to 911. Trial counsel opined that it was "a terrible mistake" to accuse the victims' father of lying about a statement he never made. Trial counsel maintained that he was "discombobulated" when he learned of his error. Trial counsel agreed that, if he had a transcript of the call available, he likely could have cross-examined the witness more effectively. Trial counsel testified that the Defendant never asked him to play the 911 recording of the call at trial.

Trial counsel said that he conducted background checks on all potential witnesses before trial utilizing a service provided by Westlaw. According to trial counsel, this service indicated that the adult victim had several criminal convictions, including a felony DUI. Trial counsel confirmed that he had not seen the certified copies of the Defendant's two misdemeanor convictions for reckless driving and possession of marijuana and drug paraphernalia. Trial counsel acknowledged that, if he had these documents at trial, he could have challenged the adult victim's claim that he had "a clean

-22-

record."  Trial counsel recognized that he apologized to the adult victim on cross-examination for suggesting he had prior convictions.

Trial counsel affirmed that he had spoken "quite a bit" with the Defendant about Mr. Whiteside and that the Defendant had informed him of the details Mr. Whiteside had provided him.  Trial counsel acknowledged that he told the Defendant he would interview Mr. Whiteside but did not.  Trial counsel relayed that he did, however, go to Mr. Whiteside's house and take photographs.

Trial counsel averred that he had initially hoped to negotiate a plea agreement in general sessions court that would allow the Defendant to plead to a misdemeanor and obtain diversion.  However, he was unable to arrange a plea agreement, so they went forward with the preliminary hearing.  Trial counsel relayed that the Defendant was adamant that he did not want a felony conviction, to serve time in confinement, or to be the subject of media attention.  According to trial counsel, he spoke with the prosecutor who asked him if the Defendant would be willing to plead guilty as charged in return for a sentence of probation.  Trial counsel said that he discussed this potential agreement with the Defendant on multiple occasions.  In these discussions, the Defendant asked if diversion was still a possibility, and there was "a lot of . . . confusion [that] took place."  Trial counsel tried to explain to the Defendant, the Defendant wife's, and the Defendant's son that the Defendant could not accept this deal of probation and still apply for diversion.  Trial counsel confirmed that he did not recommend to the Defendant that he enter an open plea because "[h]e would have no guarantee of not having jail time[.]"  When asked if he told the Defendant that "he was likely to get diversion," trial counsel said, "I told him I thought he was one of the best candidates I had ever seen for a diversion and I could not imagine a reason the [c]ourt would not grant him a diversion."

While trial counsel discussed the dangers of going to trial with the Defendant, trial counsel opined that, in hindsight, he should have focused more on the potential effect a ten-year-old victim would have on a jury.  However, trial counsel found the Defendant's version of events quite credible and hoped that a jury would find the same.

Trial counsel agreed that he did not request an instruction on reckless aggravated assault.  Trial counsel indicated that he did not do so because it was not recognized as lesser-included offense under these circumstances.

On cross-examination, trial counsel stated that he visited the scene three times.  The Defendant had informed trial counsel of the location where Mr. Whiteside's lawn mower had stalled and where the Defendant stopped and asked Mr. Whiteside if he needed help.  Trial counsel photographed Mr. Whiteside's viewpoint, which was, in trial counsel's opinion, approximately 200 yards away from where the incident occurred.  According to trial counsel, the Defendant told him many times that Mr. Whiteside said

"that he could not see the little girl, and he heard the shots and did not know what was going on." Trial counsel opined that, based upon his investigation, he did not believe Mr. Whiteside could have witnessed the incident from where he was standing.

Trial counsel maintained that, when discussing any potential plea agreement, trial counsel left the ultimate decision to the Defendant. According to trial counsel, while the case was pending, the Defendant consistently asserted that he was not guilty. Although the Defendant did express a desire to avoid trial, he was also insistent that he would not accept a felony on his record and did not want to go to jail.

Trial counsel said that he reviewed the Defendant's civil deposition with him and critiqued his performance in preparation for trial. Trial counsel maintained that the Defendant "appeared to be very agitated, very angry, very confrontational" in his deposition and that he "[e]xplained to [the Defendant] it was a train wreck if . . . he testified the same way in the jury trial that he would definitely be convicted." Trial counsel further testified that he also reviewed potential questions with the Defendant. He confirmed that they never specifically discussed "the lying question, is somebody lying[.]"

Trial counsel said that he went to the Coxes' residence and was accompanied by the Defendant. They spoke with Mrs. Cox on this occasion. Trial counsel determined that neither of them witnessed the incident. Trial counsel acknowledged that "a spent round" was "dug up," but he did not recall who was involved with that discovery. Trial counsel averred that he was never contacted by Mr. Whiteside or the Coxes. On redirect, trial counsel said that Mrs. Cox told him that she could not remember who else was present and that she "did not see anyone" when she went outside after hearing the gunshots.

Mr. Whiteside testified that, on the date in question, he saw the victims out for a walk and that he briefly spoke to them. Mr. Whiteside testified that it was "getting fairly close to dark" about thirty minutes later when his mower broke down. Mr. Whiteside relayed that he saw the Defendant drive past his house headed towards "town" and that, about "two or three minutes later," the Defendant "was coming back" and stopped to speak with him. Mr. Whiteside indicated that the Defendant told him that "somebody had said something to his wife or threatened his wife" and that he informed the Defendant that he had seen the victims walking earlier. Mr. Whiteside then declined the Defendant's offer of assistance with his mower. Mr. Whiteside estimated that this conversation lasted three to five minutes, and he described the Defendant's demeanor as "probably agitated" and "upset."

Mr. Whiteside reported that, while he was talking with the Defendant, the victims appeared on the roadside near the Coxes' home, and "[t]hey were cutting down the hill

toward their house." Mr. Whiteside said that the Defendant "took off" and "just drove down there." Mr. Whiteside testified that the Defendant did not "peel out" and that there was nothing "shocking" about his driving. Mr. Whiteside resumed working on his mower after the Defendant left. When Mr. Whiteside heard gunshots, he "looked down the road" but initially found his view partially blocked by a neighbor's house. According to Mr. Whiteside, he could see the Defendant standing with a gun in his hand when the adult victim emerged from behind a house walking towards the Defendant. Mr. Whiteside said that the Defendant was not pointing his gun at anyone but had it "pointed down." While Mr. Whiteside heard someone say "something to the effect of, 'Who are you calling a boy[,]'" he did not hear the Defendant's ever threatening to kill the adult victim. Mr. Whiteside suggested that he never saw the minor victim again after she went behind the house. After the initial gunshots, Mr. Whiteside walked towards the Defendant and the adult victim to get a better view, but he "really didn't see a whole lot after that." Mr. Whiteside confirmed that he would have been willing to testify at the Defendant's trial.

Gregory Isaacs, an attorney from Knoxville, set forth his legal credentials, stated that he had reviewed the Defendant's case, and offered his opinions on trial counsel's performance. Ultimately, Mr. Isaacs concluded that the Defendant "did not receive effective assistance of counsel."

Mr. Isaacs testified that he did not see "investigative memorandum or notes" in trial counsel's file which struck him as "odd." He also noted as "unusual" the absence of a trial outline, including potential questioning of venire members and witnesses or a draft of opening and closing statements. Mr. Isaacs said that "there was nothing in [trial counsel's] file that looked like there was any objective preparation for trial that was in writing."

Mr. Isaacs opined that "what Mr. Whiteside saw was totally different" from the other State's witnesses and that a reasonable defense attorney would have interviewed Mr. Whiteside as there appeared to be no tactical reason not to do so. Based upon Mr. Whiteside's testimony at the motion for new trial hearing, Mr. Isaacs stated that he should have been called as a witness at the Defendant's trial.

Mr. Isaacs agreed that the Defendant's state of mind was "a significant issue in the case." Mr. Isaacs indicated that interviewing neighbors, such as the Coxes, was important to locate contradictory testimony that the Defendant was driving at a high rate of speed and was using profanity.

He also opined that there was no strategic reason for trial counsel's failure to request a lesser-included instruction on reckless aggravated assault under the facts of this case. Mr. Isaacs claimed that he would have requested an instruction on reckless

-25-

aggravated assault regardless of whether it had previously been delineated as a lesser-included offense in the caselaw.

Mr. Isaacs discussed a lawyer's duty during the plea negotiation process, stating that counsel has "a duty to explore a resolution, . . . a duty to keep [the] client completely informed, and . . . a duty to promptly investigate." Mr. Isaacs opined that trial counsel had an "obligation to follow up" in a case such as this when "shots were fired" and there was "an opportunity to enter into a plea that resulted in probation" in order "to see if it c[ould] be made into a firm offer[.]"

Mr. Isaacs indicated that trial counsel should have requested a stay in the civil case, thereby prohibiting the Defendant from being deposed. Mr. Isaacs noted that the Defendant did not have to "incriminate himself or talk about the facts." Because the civil case proceeded, trial counsel should have likewise deposed the victims, in Mr. Isaacs's opinion. Mr. Isaacs did not believe that the Defendant should have answered questions under oath in the civil case about witnesses lying or whether the Defendant would accept a plea. Mr. Isaacs said that a reasonable attorney had "a duty to object if someone trie[d] to get [a] client to say someone else is lying[.]" Moreover, trial counsel should have advised the Defendant "not to be goaded into" answering questions like those again at trial, especially when dealing with a minor victim.

Mr. Isaacs indicated that proper trial preparation would have included preparing a transcript of the 911 calls. Mr. Isaacs maintained that "the importance of that 911 call was you could have had extraordinarily significant impeachment information with [the victims' father] because he dramatically changed his testimony." According to Mr. Isaacs, when trial counsel got "rattled," he should have asked for a recess rather than allowing the witness "to go unscathed." Mr. Isaacs also thought trial counsel should have sought to have the recording of the victims' father's 911 call redacted.

Sandra Cox testified that, in August of 2014, she was living with her parents on Boatmans Ridge Road to care for them. She recalled that, while watching television, she heard what "sounded like backfiring[.]" When Mrs. Cox looked outside, she saw a white truck driving away and the adult victim standing near "a pine tree." She did not see the minor victim or the victims' father at that time, but she did observe Mrs. Loven "coming out" of her home. Mrs. Cox clarified that she "just stayed right there kind of on the carport[.]" Mrs. Cox could not recall hearing any raised voices or "squealing tires or anything like that[.]" Mrs. Cox relayed that trial counsel did come to her house and interview her.

On cross-examination, Mrs. Cox noted that the living room where they were watching television that day was "back away from the road[.]" Mrs. Cox indicated that

-26-

her mother was hard of hearing, so sometimes the television was loud. Mrs. Cox testified that it would not "be unusual" for her to fail to hear those sounds.

Eddie Cox also testified at the hearing and reported that he was not present at the time of the incident. Upon learning from Mrs. Cox that gunshots had been fired, Mr. Cox returned to the home, arriving before law enforcement. Mr. Cox described that, when he arrived, he saw the minor victim crying and saw the victims' father coming up the hill from their house. Mr. Cox relayed that he grabbed a flashlight and assisted the officers in locating two of the "slugs" in the dirt. According to Mr. Cox, the slugs were found "far apart" in the field. When Mr. Cox was asked if "[t]he holes in the ground . . . were . . . closer to the house or . . . were way out in the field somewhere," he replied that they were in "the field."

The Defendant's thirty-one-year-old adult son, Matthew Ailey ("Matthew"),[3] testified. Matthew, who lived in New York, stated that he spoke with trial counsel on the phone twice on the same day about plea negotiations. Matthew believed "for over two years" that trial counsel was going to negotiate a plea agreement. Matthew said that he was surprised to learn that a trial was imminent and called trial counsel seeking an explanation, so he could help his parents understand "what had changed." Matthew inquired with trial counsel if there was "an opportunity to enter a plea agreement with the district attorney's office." According to Matthew, trial counsel told him that "the district attorney called him every day, begging him to settle" because "she did not have a very good case" but that she could not offer anything below a Class D felony because the victims would not consent to it.

Matthew also asked trial counsel about "the various outcomes." Trial counsel advised that "the only plea agreement that [the Defendant] could enter into would be a . . . full guilty plea to what was being . . . charged which was basically the same outcome as losing in the trial." He claimed that trial counsel assured him that they had "a very good case" and that he was "going to win the trial." Trial counsel also relayed to Matthew that the prosecutor had never before beaten trial counsel. According to Matthew, trial counsel told him that there was "not an outcome where [his] father [would go] to jail." Matthew stated that trial counsel informed him that the "[w]orst . . . possible outcome" if the Defendant was convicted at trial was a grant of diversion. According to Matthew, trial counsel maintained that the Defendant was the "perfect" candidate for diversion.

The trial court denied the Defendant's motion for new trial by written order filed on November 28, 2017. The case is now before us for our review.

---

[3] Because Matthew shares a surname with the Defendant, we will refer to him by his first name. Again, we do so for clarity and intend no disrespect.

ANALYSIS

I. *Sentencing*

The Defendant contends that the court erred in denying him judicial diversion or total probation and by applying certain enhancement factors. Before a trial court imposes a sentence upon a defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts ("AOC") as to Tennessee sentencing practices for similar offenses; (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (h) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The Bise standard of review applies to "appellate review for a trial court's sentencing decision to either grant or deny judicial diversion," State v. King, 432 S.W.3d 316, 325 (Tenn. 2014), and to "questions related to probation or any other alternative sentence," State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). See Carter, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2) & (4).

## A. *Judicial Diversion*

There is no dispute that the Defendant was eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B). However, simply because a defendant meets the eligibility requirements does not automatically entitle him or her to judicial diversion. State v. Bonestal, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). "Traditionally, the grant or denial of judicial diversion has been left to the sound discretion of the trial court." King, 432 S.W.3d at 323. When deciding whether judicial diversion is appropriate, a sentencing court must consider seven common-law factors in making its determination. Those factors are:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as to others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)); see also King, 432 S.W.3d at 326 (reaffirming that the Electroplating requirements "are essential considerations for judicial diversion"). The trial court must weigh the factors against each other and explain its ruling on the record. King, 432 S.W.3d at 326 (citing Electroplating, 990 S.W.2d at 229). If the trial court adhered to these requirements, "the determination should be given a presumption of reasonableness on appeal and reviewed for an abuse of discretion." Id. at 319. This court will "not revisit the issue if the record contain[ed] any substantial evidence supporting the trial court's decision." Electroplating, 990 S.W.2d at 229; see also Parker, 932 S.W.2d at 958.

A trial court is "not required to recite all of the Parker and Electroplating factors when justifying its decision on the record in order to obtain the presumption of reasonableness." King, 432 S.W.3d at 327. However, "the record should reflect that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it." Id. If the trial court "fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." Id. "In those instances, the appellate courts may either conduct a de novo review or . . . remand the issue for reconsideration." Id. at 328.

Here, the trial court first addressed the Defendant's request for judicial diversion. In denying the Defendant's request, the trial court recited and analyzed the applicable judicial diversion factors in making its determination.

The trial court initially concluded that, despite the Defendant's lack of a criminal record and his involvement in the community, he was not amenable to correction based on his "utter lack of ability to accept responsibility for his actions." The trial court specifically stated,

> I don't think he's a bad fellow at all. . . . But when somebody comes in and doesn't accept responsibility at the trial or in their deposition at no point in time. I've got several letters in here from folks, good folks that some of them I know talking about how remorseful he is and how sorry he is and all of that. I read every one of these letters, but it doesn't square with the facts. . . .
>
> He might be telling them that, but that's not what he's telling the [c]ourt and that's not what he told the [c]ourt when he testified and that's not what he's told the [c]ourt in his deposition, and I hadn't heard anything about it here today.
>
> . . . .
>
> I don't think he has—I don't think he would steal anything. I don't think he would do anything like that, but when it comes to this type action, he has refused to accept responsibility for it.

Next, the trial court found that the circumstances of the offense did not weigh in favor of judicial diversion because the Defendant's actions of tracking the victims and firing four warning shots were grossly disproportionate to the perceived "disrespect" to the Defendant's wife and property. The trial court did not find the Defendant credible when he said that he was calm as he drove around looking for the victims, and the trial court did not find relevant whether the Defendant "gun[ned] it and floor[ed] it up there or whether he just roll[ed] up there nice and smooth" when he saw the victim's coming down the road. The trial court continued:

> But anyway, so he gets his gun out so he perceives there's an alleged threat. That's what he wants me to believe, and then he gets out— and wanted the jury to believe—and so he gets back out—he gets his gun out and he comes around and then—we don't know exactly what the timeline is—but ends up firing two warning shots. Then in his own testimony there was no altercation. [The victim] just wouldn't speak to him and he wouldn't show him his hands.
>
> I cannot understand why you would shoot at that point because—so you think the person is on drugs. You think a person's deranged. You

think the person's whatever, get back in the truck. Don't fire some warning shots. I . . . cannot understand that.

And then the gentleman doesn't—keeps coming towards you. You don't see a weapon. You never saw a weapon and you fire two more shots. And this is [the Defendant's] version of events. I'm just analyzing it from his version of events. There's something about that . . . just does not compute to this court.

So at that point in time as I recall from the trial I believe he said he had one round left and so—then he gets in his vehicle and he goes home. And there's a sequence of events of people calling 911, et cetera, like that.

Having a . . . ten-year-old little girl, small girl, who in trial, today, and at all times here out throughout the process that I've had any involvement seems very traumatized by the event, and seems very—I mean there's no way you could perceive her as a threat. [The Defendant] doesn't attempt to say that he did. I'm not trying to mischaracterize his representation. But to have gunfire with a small girl there when you could've just got back in your truck and went home and called the police, you know at this point they're still in the area, it's . . . just baffling to me.

. . . . How do you have four warning shots? I don't get that. Four warning shots. Doesn't make sense to me. So then what you have is you have [the Defendant's] leaving.

The trial court then determined that the Defendant's "excellent" social history did weigh in favor diversion, noting that the Defendant, a successful businessman, was well-respected and "very active in the community." The trial court also found that the Defendant's physical and mental health weighed in favor of diversion.

Thereafter, the trial court addressed the deterrence value to the Defendant as well as others. Regarding general deterrence to others from this type of conduct, the trial court remarked, "Obviously, the State has an interest in deterring people from engaging in this type of crime and particularly a situation such as this where you have gunfire going on in what's essentially a subdivision." The trial court noted that even the Defendant "was concerned about ricochets" and that "[u]sing a weapon in this way [was] extremely dangerous." The trial court surmised that others needed to be deterred "from engaging in this type of conduct where anything could happen. People could've been killed. We could've had bullets landing in houses, no telling where." As for specific deterrence value to the Defendant, the trial court thought the Defendant "need[ed] to be

deterred from this kind of conduct" because the Defendant in his deposition stated that "he did nothing wrong."

Finally, the trial court considered whether a grant of judicial diversion would serve the interest of the public, as well as the Defendant. The trial court noted that "certainly [the Defendant] would be benefited if he was granted a judicial diversion." However, the trial court concluded that, although diversion would benefit the Defendant's employees and those impacted by the Defendant's community involvement, the interest of the public in general would not be served by granting diversion because the Defendant "sho[t] off four rounds in an area with bullets ricocheting."

The trial court then concluded, "So when I weigh all of the factors and consider them, I do not believe [the Defendant] is a candidate—a proper candidate for judicial diversion. For those reasons I'm denying his request for judicial diversion."

The Defendant submits that he was amenable to correction because he acknowledged wrongdoing and that the trial court erred by requiring him "to admit to legal guilt" in order to be granted diversion. The Defendant notes that the trial court relied heavily on his deposition testimony in the civil matter to determine the Defendant's amenability to correction, reading a large portion of that testimony into the record at the sentencing hearing. He also maintains that the trial court failed to consider his allocution letter in determining his amenability to correction.

Indeed, the Defendant was not legally required to admit his guilt for the aggravated assault charges in order to receive diversion. However, "there is a critical distinction between confessing guilt to a crime and accepting responsibility for wrongful conduct." Stanton v. State, 395 S.W.3d 676, 688 (Tenn. 2013). "Admitting that one's conduct complies with the elements of a criminal offense and accepting responsibility for wrongful conduct are not necessarily synonymous. . . . A defendant may admit and assume responsibility for wrongdoing without admitting that he or she has committed a crime." Id. This court has determined that a defendant's lack of remorse or refusal to accept responsibility for his or her actions relates to the amenability to correction and is an appropriate factor to consider in deciding whether to grant or deny judicial diversion. See State v. Joseph W. Denton, No. M2009-02546-CCA-R3-CD, 2010 WL 4069264, at *5 (Tenn. Crim. App. Oct. 19, 2010).

The trial court determined that the Defendant was not amenable to correction because he refused to accept responsibility for his actions and not because, as the Defendant contends, he failed to admit legal guilt. The Defendant consistently focused on the victims' actions rather than his own despite evidence that he got in his truck and tracked the victims, that he fired warning shots near a ten-year-old girl, and that he never saw the adult victim with a weapon. The Defendant offered no explanation for his

-32-

decision to shoot his weapon rather than merely get back inside his truck. The Defendant's failure to admit any wrongdoing or to accept any responsibility for his actions was a relevant consideration for the trial court in determining the Defendant's qualification for diversion.

The Defendant contends that the trial court did not consider his allocution letter in rendering its decision. However, the trial court indicated generally throughout its ruling that it reviewed the letters offered by the Defendant. The allocution letter was entered as a separate exhibit to the sentencing hearing. Defense counsel stated that, due to the pending civil matter, he had asked the Defendant "to do his allocution in writing to submit to the [c]ourt." Defense counsel opined that "the overwhelming point" conveyed in the letter" was as follows: "that this is a person who takes this very seriously and for whom this process is very important and that–the possibility of continuing to live his life in an exemplary fashion is extremely important." The trial court acknowledged receipt of the letter. Before rendering its sentencing determination, the trial court stated, "All right. I'm going to take a few moments[] recess to review your response to the enhancement factors that the State has filed and consider some of the other documents that have been presented and then I'll be back to rule in a little while." A trial court is not explicitly required to list and discuss each piece of evidence submitted. The record reflects that the trial court considered the allocution letter.

In the letter, the Defendant expressed regret that he "put" himself, his family, and his friends "in a situation like this" and averred that his family and employees suffered due to his actions. He did not acknowledge that his actions endangered the victims or emotionally and psychologically harmed them in any way. The allocution letter does not support the Defendant's assertion that he is amenable to correction but, instead, supports the trial court's conclusion that the Defendant failed to take responsibility for his actions.

Next, the Defendant argues that "[t]he trial court's conclusion that the circumstances of the offense justified a denial of diversion and imposition of a sentence of incarceration wholly departed from the purposes and principles of the Sentencing Act" because "first-time offenders whose criminal offense was impulsive and out of character are ideal candidates for diversion[.]" (Emphasis removed). The Defendant notes that "the trial court found that the circumstances of [the] offense didn't make sense and were out of character" but, nonetheless, weighed this factor against the Defendant's receiving judicial diversion. According to the Defendant his "actions lacked planning, were of limited duration[,] and represent[ed] a marked deviation from an otherwise law-abiding life."

However, the aberrant nature of the Defendant's conduct does not require a grant of judicial diversion but is merely a factor that can be considered in the trial court's diversion determination. The fact that the Defendant's actions may have been impulsive

and atypical does not negate all other facts and circumstances surrounding the offense. Moreover, the trial court did consider the Defendant's "otherwise law-abiding life" in its judicial diversion decision, although not specifically in its discussion of the circumstances of the offense. In concluding that the facts and circumstances of the offense did not weigh in favor of judicial diversion, the trial court fully explained its findings, and those findings are supported by the record. We cannot say that the trial court abused its discretion in determining that the circumstances of the offense weighed against a grant of judicial diversion.

The Defendant further submits that "[t]he trial court denied diversion . . . without placing specific findings on the record regarding the need for [general] deterrence other than the deterrent value inherent in all criminal convictions." The Defendant remarks that the trial court failed to mention in weighing the deterrence factor the considerations outlined in State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2000), and that "its generalized statements about the need to deter others from committing aggravated assault also conflicts with the analysis required by Hooper." Furthermore, the Defendant contends that "the trial court's conclusion that [the Defendant], specifically, 'needs to be deterred from this type of conduct' conflicts with the court's own findings that [the Defendant's] behavior was an anomaly, that he wasn't a 'candidate to commit other offenses,' and that he has an excellent social history and lack of criminal history." The Defendant notes that the trial court's determination regarding specific deterrence continued to "highlight[] the court's repeated undue, improper reliance on [the Defendant's] deposition testimony."

However, Hooper did not involve the denial of diversion. See State v. Hamilton, 498 S.W.3d 7, 19 n.7 (Tenn. 2016) (our supreme court declining to state specifically whether Hooper applied to the pretrial diversion statute); see also State v. Dylan Ward Hutchins, No. E2016-00187-CCA-R3-CD, 2016 WL 7378803, at *6 (Tenn. Crim. App. Dec. 20, 2016). Regardless, in Hooper, our supreme court stated that a trial court that relies exclusively upon the need for deterrence to deny probation must show "a need to deter similar crimes . . . in the particular community, jurisdiction, or in the state as a whole, and . . . incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes." 29 S.W.3d at 10. As the trial court here relied upon factors other than the need for deterrence when denying diversion, the trial court did not err by failing to enumerate the Hooper factors, even assuming that Hooper applied.

The trial court first examined the general deterrent effect to others from this type of conduct, focusing on the dangers of the Defendant's firing his weapon in what was "essentially a subdivision" and the possibility of "ricochets." The trial court concluded that "[u]sing a weapon in this way [was] extremely dangerous." The trial court also determined that diversion was not a suitable deterrent for the Defendant because he

-34-

persisted in justifying his actions and failed to acknowledge any wrongdoing. We cannot conclude that the trial court abused its discretion in weighing the need for deterrence to the Defendant and others against a grant of diversion.

In addition, the Defendant asserts that "[t]he trial court concluded the best interests of the public weighed against granting [the Defendant] judicial diversion . . . in contradiction of the rehabilitative purpose of the Sentencing Act and the court's findings that [the Defendant] was a productive member of society whose criminal conduct was aberrant." Stated another way, the Defendant maintains that "[t]he trial court did not consider that the fundamental purpose of the alternative sentences is rehabilitation and that it is in the best interests of society that an isolated, one-time offender be given a path to be restored fully to productive citizenship." (Internal quotations marks omitted).

The trial court considered whether a grant of judicial diversion would serve the interest of the public, as well as the Defendant. The trial court noted that "certainly [the Defendant] would be benefited if he was granted a judicial diversion." However, the trial court concluded that, although diversion would benefit the Defendant's employees and those impacted by the Defendant's community involvement, the interest of the public in general would not be served by granting diversion because the Defendant "sho[t] off four rounds in an area with bullets ricocheting." The trial court acted within its discretionary authority in weighing this factor.

The record reflects that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it. See King, 432 S.W.3d at 327. The Defendant has failed to overcome the presumption of reasonableness afforded to the trial court's decision denying him judicial diversion.

## B. *Length of Terms and Probation*

After denying the Defendant's judicial diversion request, the trial court jointly addressed alternative sentencing, the length of the sentencing terms, and consecutive sentencing. The trial court initially outlined the various purposes and principles of the Sentencing Act and listed the considerations for alternative sentencing. Next, the trial court analyzed the enhancement and mitigating factors found in Tennessee Code Annotated sections 40-35-113 and -114.

In reviewing the applicable enhancement factors, the trial court found that three applied to the Defendant: (4) that the minor victim was particularly vulnerable because of age or physical or mental disability; (6) that the personal injuries inflicted upon the minor victim were particularly great; and (10) that the Defendant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-3-

-35-

113(4), (6), (10). In mitigation, the trial court found applicable that the Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it was unlikely a sustained intent to violate the law motivated the criminal conduct. See Tenn. Code Ann. § 40-35-113(11). The trial court, in applying this mitigating factor, determined, "I think he got upset when his wife was insulted and his property was violated and he went to confront the individual about it, and it just didn't go down the way that he expected it to." The trial court also addressed the so called "catch-all" mitigating factor. See Tenn. Code Ann. § 40-35-113 (13) ("Any other factor consistent with the purposes of this chapter."). The trial court stated, "I can't find any other factors [in addition to mitigating factor 11]. But I don't know of any other factors to consider."

The trial court then proceeded to address several considerations listed by the Defendant under mitigating factor (13). The trial court agreed that the Defendant had no prior criminal convictions, that he "was raised in a good and stable family," and that he had a substantial support system. The trial court also cited the Defendant's employment record, strong work ethic, regular church attendance, and community outreach. Furthermore, the trial court remarked that the Defendant had no known attitude or behavior issues aside from this incident, that the Defendant did not abuse drugs or alcohol, that the Defendant had numerous family responsibilities, and that others depended on the Defendant for their employment. In addition, the trial court stated that it had read the many letters submitted on behalf of the Defendant describing his "good reputation" in the community and that "the content of the letters [was] strongly favorable" to him.

After discussing the enhancing and mitigating factors, the trial court commented, "Now it comes time to impose a just and right sentence and keep in consideration the sentencing factors that I'm supposed to consider." The trial court indicated that sentencing the Defendant presented "a Catch-22" because the Defendant had "led from all indication an exemplary life," but the court was "very concern[ed]" that the Defendant still did not "think he did anything wrong." The trial court observed that the Defendant's inability to appreciate the wrongfulness of his conduct was "really . . . where the rubber me[t] the road in this case." The trial court remarked that the victims' parents had to watch from a distance as the Defendant fired the shots and wonder if the Defendant would have different "feelings" about the appropriate punishment if "the shoe was on the other foot."

In rendering its decision, the trial court initially noted that this was "the most difficult decision" it had "ever had to make." The trial court first determined that consecutive sentencing was not appropriate. The trial court then set the length of the Defendant's sentences at four and one-half years.[4] Finally, the trial court denied full

---

[4] The Defendant was convicted of two Class C felonies as a Range I, standard offender. Thus, the

probation and ordered the Defendant to serve six months' confinement before being released on supervised probation.

1. Enhancement Factors. The Defendant contends that the trial court erred in its application of all three enhancement factors. The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210(d)-(f); Carter, 254 S.W.3d at 342-43. The trial court is "to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." Carter, 254 S.W.3d at 345. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." Bise, 380 S.W.3d at 706.

We will focus our examination on the trial court's application of enhancement factor (10)—the Defendant had no hesitation about committing a crime when the risk to human life was high—because this was the only factor found to be applicable to both of the Defendant's aggravated assault convictions. The Defendant complains that the State failed to present any proof establishing that there was a high risk to human life to anyone other than the two, named aggravated assault victims. According to the Defendant, the trial court erred by applying "factor based on the possibility that the bullets [he] fired into the ground could have ricocheted" when the State failed to establish that specific individuals were endangered by the Defendant's actions.

Where, as here, a high risk to human life is inherent in the underlying conviction, enhancement factor (10) only applies if a defendant's actions posed a high risk to the life of a person other than the named victim. See State v. Imfeld, 70 S.W.3d 698, 707 (Tenn. 2002); State v. Zonge, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997). The Defendant cites to State v. Hill, 885 S.W.2d 357, 363 (Tenn. Crim. App. 1994); State v. Grady Lee Flippo, No. M2006-01182-CCA-R3-CD, 2007 WL 1628868, *10-11 (Tenn. Crim. App. June 6, 2007); and State v. Antray Terrill Morrow, No. W2002-02065-CCA-R3-CD, 2003 WL 22848974, at *4 (Tenn. Crim. App. Nov. 25, 2003), in support of his allegation of trial court error. In Hill, the defendant was convicted of aggravated assault for cutting his victim during a street fight. 885 S.W.2d at 359. This court concluded that the trial court erred by applying enhancement factor (10) to the defendant's conviction because

---

Defendant faced a sentencing range of three to six years. See Tenn. Code Ann. § 40-35-112 (a)(3).

"the record [was] devoid of any evidence that individuals in close proximity [to the fight] were in danger of being injured." 885 S.W.2d at 363. In Flippo, the trial court applied factor (10) to the defendant's two convictions for attempted aggravated assault where the defendant brandished a gun at two people stopped on the side of a highway. 2007 WL 1628868, at *11. This court held that the trial court's application of factor (10) was in error because, although the record showed that other drivers were on the road the day of the offense, it failed to show that "the actions of the defendant actually created a risk to the life of any other specific person." Id. Finally, in Morrow, the defendant fired shots at a house where four named victims were standing on the porch and a fifth named victim was inside the house. 2003 WL 22848974, at *4. The jury convicted the defendant of four counts of aggravated assault and one count of felony reckless endangerment. Id. at *1. At sentencing, an investigator testified that the shooting occurred in "[a] heavily populated residential area" and that there was a daycare center located nearby. Id. at *3. However, no reports were received of gunshots striking nearby homes, and no evidence was presented as to whether the daycare center or any of the nearby residences were occupied at the time of the shooting. Id. There, the State conceded error in the application of factor (10), and this court determined that proof failed to show that "the shots actually created a risk to the life of any other specific person." Id. at *4 (citation omitted).

Here, the trial court acknowledged that enhancement factor (10) was normally inherent in the offense of aggravated assault but determined that the factor "clearly applie[d]" based upon the facts of this case. The trial court, in applying this factor, referred to the fact that the Defendant fired four warning shots in a residential neighborhood and that there were "two individuals out there" when the Defendant discharged his weapon. The trial court also noted the Defendant's testimony that he knew "bullets [were] going to be ricocheting" and the Defendant's claim that "he pulled off to the left because he didn't want to shoot down in the direction" of inhabited places, instead firing towards the woods. The trial court concluded that the risk to human life in "the surrounding area" was high.

The Defendant testified at trial that he aimed to the left and "fired into the field and the wood line" because he "didn't want a ricochet." He said that he fired without taking direct aim at the victims because they were standing in an area that presented "the perfect ricochet situation." The adult victim, however, claimed that the Defendant initially fired towards he and his sister, "blowing dirt all over" them. The minor victim asserted that the Defendant pointed the weapon at their heads and that "[d]irt splattered all over [them]" from the first shots that the Defendant fired. The victims' father testified that "dirt flew" on the minor during the episode. There was also testimony that the Defendant was angry and that he frequently threatened to kill the victims during the encounter.

-38-

Moreover, the cases cited by the Defendant—Hill, Flippo, and Morrow—are factually distinguishable. Here, the Defendant did not wield a knife but fired a gun four times in a residential neighborhood. He did more than merely display his weapon to the victims as others passed by. Additionally, the State did not simply assert that the Defendant fired shots in a residential area but instead presented evidence that specific bystanders were in close proximity and in danger of being injured. There were multiple reports from neighbors that they heard gunshots, including the victims' parents, the Lovens, and Mr. Drinnon on the 911 call. Both the victims' parents and Mr. and Mrs. Loven testified that they were outside and witnessed the Defendant fire his weapon. The victims' parents both stated that they were standing in front of their home, which was down the hill from where the events occurred, when the Defendant shot at their children. The victims' mother testified that she started to wave her arms, jump up and down, and repeatedly scream at the Defendant, pleading with him not to kill her children. Mrs. Loven testified that she saw the Defendant's truck and the victims "in the field" nearby when she looked out her window. According to Mrs. Loven, the initial shots sounded "awful close" to her home, and when she went outside, she saw the Defendant fire a fourth shot towards the adult victim. Mr. Loven stated that he was "in the driveway behind [his] house" working on his daughter's car when he heard a gunshot. Mr. Loven asserted that the second shot "seemed closer." When Mr. Loven went to see what was happening, he saw the Defendant shoot again. The adult victim explained at trial that the Loven's home was "right across from where [the Defendant] was parked." An aerial photograph of the neighborhood showing the location of the various homes, as well as witnesses marking their respective positions thereon, was admitted into evidence.

The photograph supports the trial court's conclusion that this factor applied. We conclude that the trial court acted within its discretion in considering this factor because the Defendant's actions created the risk of a stray bullet striking one of the people standing nearby watching the incident unfold. See, e.g., State v. Randy Cotham, No. 01C01-9509-CC-00287, 1996 WL 695168, at *4 (Tenn. Crim. App. Dec. 5, 1996) (concluding that the record supported the application of factor (10) because "the proof established that, at the time of the shooting, there were several other people sitting in the parking lot of the Stetson Boot Company or 'milling around'" and that the shooting, in fact, "occurred during the course of a change in shifts at the company"); State v. John L. Smith, No. 01C01-9309-CR-00308, 1994 WL 585403, at *6 (Tenn. Crim. App. Oct. 20, 1994) (finding use of factor (10) appropriate when the defendant fired a gun into a restaurant where a patron was seated at the bar and a bus boy was cleaning tables and where another waiter was accompanying the victim when that victim was shot outside as the Defendant was leaving).

The trial court sentenced the Defendant within the appropriate statutory range for each conviction and articulated in the record its reasons for imposing the sentences. Even

if the trial court misapplied the other two challenged enhancement factors to the aggravated assault conviction regarding the minor victim, the presence of enhancement factor (10) for both convictions supported the trial court's decision to enhance the Defendant's sentences. We repeat that a trial court's erroneous consideration of some enhancement or mitigating factors, which are merely advisory, does not give this court grounds for reversal when the trial court otherwise conforms with the mandates of the Sentencing Act. See Bise, 380 S.W.3d at 709-10; Carter, 254 S.W.3d at 346. The record demonstrates that the trial court otherwise sentenced the Defendant in accordance with our Sentencing Act. Accordingly, we cannot say that the Defendant has established that the trial court abused its discretion in setting the length of his sentences at four-and-one-half years. See, e.g., State v. Andrew Young Kim, No. W2017-00186-CCA-R3-CD, 2018 WL 1679346, at *11 (Tenn. Crim. App. Apr.6, 2018); State v. Joshua Iceman, No. M2016-00975-CCA-R3-CD, 2017 WL 4805118, at *32 (Tenn. Crim. App. Oct. 24, 2017), perm. app. denied (Tenn. Feb. 14, 2018); State v. Richard Dickerson, No. W2012-02283-CCA-R3-CD, 2014 WL 1102003, at *12 (Tenn. Crim. App. Mar. 19, 2014) (all three cases concluding that the trial court improperly considered two of three enhancement factors it applied but, nonetheless, otherwise conformed with the mandates of the Sentencing Act, so the defendant was not entitled to relief).

2. Especially Mitigated Offender. Finally, the Defendant asserts that, "[b]ecause no enhancement factors applied to [him], and the trial court applied at least one [mitigating] factor, the court erred by failing to sentence [him] as an especially mitigated offender." The Defendant remarks that the trial court found that factor (11) applied in mitigation because it was unlikely that a sustained intent to violate the law motivated the Defendant's conduct. The Defendant also states that he presented nine allegations under the "catch-all" provision, mitigating factor (13), "many of which the trial court found to be factually accurate, but the trial court did not state whether it applied any of them to [the Defendant's] sentence, or whether it gave them any weight." The Defendant concludes, "As such, his [R]ange I minimum sentence should have been reduced by 10% and/or his release eligibility should have been reduced to 20% of the sentence."

A trial court "may find the defendant is an especially mitigated offender" if he has no prior felony convictions and the court finds mitigating factors but no enhancement factors. Tenn. Code Aim. § 40-35-109(a). We have concluded that the trial court properly considered enhancement factor (10), and the Defendant was thus not statutorily eligible for sentencing as an especially mitigated offender. Moreover, sentencing a defendant as an especially mitigated offender is discretionary with the trial court, not mandatory. State v. Stephen Anthony Scott, No. M2012-01416-CCA-R3-CO, 2013 WL 5675472, at *4 (Tenn. Crim. App. Oct. 17, 2013). "[E]specially mitigated status is reserved for 'instances where the trial judge may desire to depart from even the minimum sentence for a Range I offender and impose lesser penalties.'" Id. (quoting Tenn. Code

Ann. § 40-35-109, Sentencing Comm'n Cmts). Accordingly, the Defendant is not entitled to relief on this issue.

3. Full Probation. A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6)(A). However, no longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing. Carter, 254 S.W.3d at 347. Tennessee Code Annotated section 40-35-102(6) is now only advisory. See Tenn. Code Ann. § 40-35-102(6)(D).

Regardless, an offender is eligible for probation if he or she is sentenced to ten years or less and has not been convicted of certain specified offenses. See Tenn. Code Ann. § 40-35-303(a). While the trial court was required to automatically consider probation as a sentencing option, see Tennessee Code Annotated section 40-35-303(b), no criminal defendant is automatically entitled to probation as a matter of law, see State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). It is the defendant's burden to establish his or her suitability for full probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." Hooper v. State, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds, State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). Among the factors applicable to probation consideration are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. State v. Grear, 568 S.W.2d 285, 286 (Tenn. 1978).

A trial court should consider the following when determining any defendant's suitability for alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1).

-41-

On appeal, the Defendant raises his arguments with the trial court's denial of judicial diversion and full probation jointly. However, the issues of diversion and probation, although similar, involve separate and distinct analyses, and as outlined above, the trial court addressed the two individually. After denying the Defendant's request for judicial diversion, it jointly considered the issues of alternative sentencing, the length of the sentencing terms, and consecutive sentencing. Furthermore, we reiterate that we have found the Defendant's arguments regarding the denial of judicial diversion do not entitle him to relief.

The trial court set forth all of the relevant sentencing purposes and principles at the outset of its ruling. The trial court then considered the applicable enhancing and mitigating factors. Ultimately, the trial court denied full probation and ordered the Defendant to serve six months' confinement, opining that a split confinement sentence balanced the needs of the Defendant's business with the facts and circumstances of the case. Specifically, the trial court reasoned as follows:

> The next question becomes how does [the Defendant] serve that 4.5 years? Does he serve that on incarceration, does he serve some form of split confinement, or does he serve state—on state probation?

> And I don't believe that 4.5 years of incarceration is the appropriate sentence for [the Defendant]. I don't . . . believe that. His business would no doubt suffer. That won't take away from the incident that happened. What's done is done. So I don't think 4.5 years of incarceration is justified under these . . . circumstances.

> The next question becomes on the opposite side of that, do I believe probation, straight probation is the appropriate sentence under this case? And there's some considerations that would suggest it is, but when I analyzed all of the facts and circumstances of the case and I just— everything I previously talked about and the record as a whole, I cannot conclude that straight probation is the appropriate sentence . . . .

> And that's a difficult statement for me to make because . . . people like [the Defendant] [are] who we all should aspire to be as far as his social conduct and things of that nature, and I'm not trying to get myself in trouble here by saying too many complimentary things about the [D]efendant, it's just the facts that he has led a very good life.

> But, it comes a time when we're responsible for our actions and we have to pay for the actions we take. Whatever those are. So . . . having said [that] I don't think 4.5 years of incarceration is appropriate and I don't

-42-

feel state probation is appropriate, the sentence that I feel is appropriate under this case is a split confinement sentence of six months. . . .

. . . I don't think [the Defendant] is a bad person. I really do not, but I have to do what I think is appropriate.

And the question that I leave with is if the shoe was on the other foot what would be appropriate and in my opinion six months split confinement is the appropriate sentence on this case. And ordinarily I would not do that. Ordinarily I would just sentence the person to incarceration and that would be it. That's what I would ordinarily do.

But, [the Defendant] has such a good social history and many people depending on him and his business that I don't think the interest of justice would be served by incarcerating him any further.

The record reflects that the trial court, in denying the Defendant full probation, took into account the relevant considerations by examining the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. See Grear, 568 S.W.2d 285, 286 (Tenn. 1978). The trial court also stated that it was relying on "everything [it had] previously talked about," which included discussing the Defendant's potential for rehabilitation and his amenability to correction. It further stated its desire to "impose a just and right sentence" in relation to the seriousness of the offense. Upon review, we conclude that the trial court did not abuse its discretion by denying the Defendant's request for full probation and by ordering that he serve six months in confinement.

4. Procedural Issues. The Defendant raises several procedural issues in addition to the one dealt with above regarding the trial court's consideration of his allocution letter. We have already determined that issue to be without merit.

The Defendant contends that the trial court erred when it concluded that, because the victims were cross-examined during trial, it would not permit questioning following their victim impact testimony at the sentencing hearing. The Defendant, citing Tennessee Code Annotated section 40-35-209(b), maintains that the trial court's ruling denied him "a fair opportunity to rebut" the victim impact testimony. In addition, the Defendant remarks that "[t]he trial court did not question [the minor victim] about her counseling or medication, and in further contravention of the Sentencing Act, did not allow counsel to ask specific questions of [the minor victim] following her testimony at the sentencing hearing because she 'was cross-examined during trial.'"

-43-

Tennessee Code Annotated section 40-35-209(b) provides, in its entirety, as follows:

> At the sentencing hearing, the court shall afford the parties the opportunity to be heard and present evidence relevant to the sentencing of the defendant and may afford the victim of the offense or the family of the victim the opportunity to testify relevant to the sentencing of the defendant. The court may allow the parties to subpoena witnesses and call or cross-examine witnesses, including, but not limited to, the person who prepared the presentence report and any person whose information contained in the presentence report is relevant to the sentencing decision. At the sentencing hearing, the district attorney general shall be the first party to present evidence and then the defendant shall have an opportunity to present evidence. Both parties may be allowed to call witnesses in rebuttal. The rules of evidence shall apply, except that reliable hearsay, including, but not limited to, certified copies of convictions or documents, may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted; provided, that this subsection (b) shall not be construed to authorize the introduction of any evidence secured in violation of the United States or Tennessee constitutions.

The specific provision of this section cited by the Defendant, providing an opposing party "a fair opportunity to rebut" certain evidence, deals with the admission of hearsay and not live testimony by a victim. It does not entitle the Defendant to the relief he seeks. Moreover, the Defendant has not provided us with any authority, and we know of none, that requires the trial court to question the victims at a sentencing hearing.

Even if the trial court erred in prohibiting cross-examination of the victims, such error was harmless because it did not affect the outcome of the case. See State v. Whited, 506 S.W.3d 416, 449 (Tenn. 2016). Much of the information provided by the minor victim regarding her mental health was similar to testimony given at trial and in the written victim impact statements contained in the presentence report. Importantly, as discussed above, enhancement factor (10) was properly applied to both of the Defendant's convictions, and the trial court did not abuse its discretion in imposing within-range sentences for the Defendant.

Next, the Defendant argues that the trial court, in issuing its sentencing decision, failed to consider the presentence report and the statistical information provided by the AOC as to Tennessee sentencing practices for similar offenses. Moreover, he notes that there was no validated risk and needs assessment prepared or included in the presentence report.

First, we will address the absence of a validated risk and needs assessment from the presentence report.  As part of the Public Safety Act of 2016, section 40-35-207 was amended to require the results of a "validated risk and needs assessment" be included in the presentence report.  See Tenn. Code Ann. § 40-35-207(a)(10).  A "validated risk and needs assessment" is "a determination of a person's risk to reoffend and the needs that, when addressed, reduce the risk to reoffend through the use of an actuarial assessment tool designed by the department that assesses the dynamic and static factors that drive criminal behavior."  Tenn. Code Ann. § 40-35-207(d).  Section 40-35-210(b) lists the risk and needs assessment as one of the sources that a trial court must consider in determining a defendant's sentence.  "However, the statute does not mandate that any particular weight be given to the risk and needs assessment, and . . . the weight to be assigned to the assessment falls within the trial court's broad discretionary authority in the imposition of sentences."  State v. Christopher C. Solomon, No. M2018-00456-CCA-R3-CD, 2018 WL 5279369, at *7 (Tenn. Crim. App. Oct. 23, 2018) (citing Bise, 380 S.W.3d at 708).

The Defendant never objected at the sentencing hearing to the lack of a validated risk and needs assessment in the presentence report.  "The failure to make a contemporaneous objection constitute[s] waiver of the issue on appeal."  State v. Gilley, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008).  Therefore, the issue is waived.  See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); see also State v. Flynn, 675 S.W.2d 494, 498 (Tenn. Crim. App. 1984) (holding that the defendant's failure to object at the sentencing hearing to a statement in his presentence report precluded consideration of the issue on appeal); State v. Joshua Lishun Brewer, No. E2015-02178-CCA-R3-CD, 2016 WL 6087677 at *5 (Tenn. Crim. App. Oct. 18, 2016) (concluding that the defendant waived an argument by failing to "object at the sentencing hearing to the admission of the presentence report as an exhibit or to any of the report's contents"); State v. Roger M. DeMass, No. M2000-0344-CCA-R3-CD, 2000 WL 1277359, at *5 (Tenn. Crim. App. Aug. 31, 2000) (determining that the issue was waived on appeal because the defendant failed to object to the lack of technical compliance with Tennessee Code Annotated § 40-35-304(b) requiring the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss).  Moreover, despite the absence of this assessment, the record reflects that the trial court extensively considered the Defendant's potential for rehabilitation and his amenability to correction in its sentencing determination.

The Defendant also argues that the trial court generally failed to consider the presentence report, as well as the statistical information provided by the AOC as to Tennessee sentencing practices for similar offenses.  According to the Defendant, "[t]he trial court was required to consider the presentence report, but made only one reference to

the contents of the report, noting [the minor victim's] victim impact statement indicated she was 'greatly affected' by what happened." In addition to this one reference, the trial court indicated at the outset of the sentencing hearing that it had read "all" of the information submitted prior to the hearing, which included the presentence report. The information in the presentence report was mentioned by the trial court throughout its ruling, despite the fact that it did not specifically refer to the report as it source.

Also, similar to the allocution letter, the statistical information provided by the AOC was entered as a separate exhibit to the sentencing hearing. Defense counsel remarked that, based upon his review of the report, "it [was] not unusual at all for a person to be placed on probation for a Class C felony." As relayed above, the trial court, before rendering its sentencing determination, stated that it would take a recess to review the Defendant's "response to the enhancement factors that the State ha[d] filed and consider some of the other documents that ha[d] been presented[.]" The record reflects that the trial court considered the presentence report and the statistical information from the AOC. We reiterate that a trial court is not explicitly required to list and discuss each piece of evidence submitted. These procedural issues do not entitle the Defendant to any relief.

## II. Ineffective Assistance of Counsel

Although a defendant may raise an ineffective assistance of counsel claim in his motion for new trial, this court has repeatedly noted that "the practice . . . is fraught with peril since it is [typically] impossible to demonstrate prejudice as required" at that stage of the proceedings. State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (internal quotation marks omitted). Nevertheless, there is no prohibition against litigation of ineffective assistance of counsel claims as part of the motion for new trial, as opposed to collateral proceedings. See State v. Burns, 6 S.W.3d 453, 461-63 (Tenn. 1999); State v. James Paris Johnson, No. E2008-02555-CCA-R3-CD, 2010 WL 3565761, at *17 (Tenn. Crim. App. Sept. 15, 2010). In the present case, the Defendant raised the issue, through newly appointed counsel, in his motion for a new trial, and the matter was fully litigated.

The same standard applies to claims of ineffective assistance of counsel raised in a motion for new trial and in a petition for post-conviction relief. See Burns, 6 S.W.3d at 461 n.5 (emphasis added) (citing State v. Anderson, 835 S.W.2d 600 (Tenn. Crim. App. 1992)).[5] Accordingly, the following post-conviction relief tenets apply. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting

---

[5] The Defendant disagrees that the same standard of review applies to ineffective assistance of counsel claims raised on appeal from the denial of a motion for new trial. However, our supreme court has expressly stated to the contrary.

his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the lower court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the lower court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

### A. *Failure to Interview and Present Witnesses*

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App. July 1, 2009). Rather,"[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. The United States Supreme Court has said, "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

Once a petitioner presents a witness at the evidentiary hearing who he claims should have been called at trial, the court must determine whether the testimony would

have been (1) admissible at trial and (2) material to the defense. Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008). The court is justified in finding that counsel was not deficient by failing to call a witness if it determines that the witness's testimony would have been inadmissible at trial or that, even if admissible, would not have materially aided in the petitioner's defense at trial. Id. If the proffered testimony is both admissible and material, the court must assess the credibility of the witness. Id. at 869-70.

The Defendant argues that trial "counsel failed to investigate and interview witnesses who possessed critical evidence, who could have been found by a reasonable investigation, and who would have testified favorably in support of his defense." First, the Defendant alleges that trial counsel should have interviewed Joe Whiteside. According to the Defendant, Mr. Whiteside's testimony would have supported his defense and undermined the State's case against him. The Defendant contends that "it would have been extremely significant" corroboration of his version of events—that the Defendant, whom the victims "claimed was enraged," stopped to talk with Mr. Whiteside and offered to help him with his lawn mower; that Mr. Whiteside "did not notice anything erratic about the Defendant's driving in contrast to the tire squealing claims"; that the Defendant told Mr. Whiteside that someone had threatened the Defendant's wife; that Mr. Whiteside saw, from his front yard, the victims "cutting down the hill toward their house"; and that "[i]t is inconceivable" that Mr. Whiteside would resume working on his mower if the Defendant "had torn off down to confront" the victims. The Defendant further notes that, when Mr. Whiteside heard gunshots, he moved closer to get a better view down the road, and at that time, Mr. Whiteside did not see the minor victim in the foray. However, Mr. Whiteside did see the adult victim walking towards the Defendant and heard someone say something to the effect of, "Who are you calling a boy." In addition, Mr. Whiteside testified that the Defendant "was not pointing the pistol at anyone and had the pistol down to his side." The Defendant surmises that trial counsel's decision not to interview Mr. Whiteside based upon trial counsel's belief that Mr. Whiteside's "vantage point was not good enough" to see the altercation amounted to ineffective assistance of counsel.

In issuing its ruling, the trial court noted that it was "concerned about [trial counsel's] failure to interview Joe Whiteside after repeated request[s]" by the Defendant to do so. Ultimately, the trial court concluded that trial counsel's failure to interview "Mr. Whiteside, while concerning, d[id] not constitute ineffective assistance of counsel given the information provided to him by [the Defendant] and the State prior to the trial." The trial court cited trial counsel's testimony that the Defendant "had informed him of what Mr. Whiteside would testify about and [that trial counsel] did not believe it would help their case." The trial court stated that it had heard Mr. Whiteside's testimony at the motion for new trial hearing and was "convinced that [Mr. Whiteside's] testimony would not have impacted [the Defendant's] case." The trial court reasoned as follows:

-49-

Mr. Whiteside did not describe [the Defendant] as being completely calm and instead said that [the Defendant] appeared agitated; furthermore, Mr. Whiteside testified that when he first looked up after the shots that he could not see [either victim] and after a short time saw the [adult victim] walk up from behind a house, which would not have placed [the adult victim] in a position to be a threat to [the Defendant]. Moreover and perhaps most importantly, [the Defendant] told [trial counsel] in their first meeting what happened during the altercation, gave a deposition about what happened, and testified about what happened during the underlying jury trial, and based on [the Defendant's] testimony, it is hard to imagine that any witness would have been able to make a difference in the case because [the Defendant] acknowledges that [neither victim] ever charged him, threatened him, or attempted to do anything to him. [The Defendant] further testified that he fired the shots after ordering [the adult victim] to "show me your hands" and that [the adult victim] did not comply. [The Defendant] testified that he felt like he had the authority to make such a demand of [the adult victim] even though this incident occurred some distance removed from the [Defendant's] property on land owned by relatives of the [victims] and a public roadway.

The trial court, in addressing the prejudice prong of Strickland, determined that Mr. Whiteside's

testimony certainly did little to nothing to change or discredit the State's proof . . . . The minor discrepancies that [Mr. Whiteside's testimony] would have created in the trial d[id] not in any way take away from the core facts that the jury heard. [The Defendant] testified that there were no threats made to him by [the adult victim] prior to him firing the pistol in his direction.

The record supports the trial court's findings. Trial counsel testified that he had spoken "quite a bit" with the Defendant about Mr. Whiteside prior to trial and that the Defendant had told him many times that Mr. Whiteside said "that he could not see the little girl, and he heard the shots and did not know what was going on." Trial counsel maintained that he knew "exactly what Mr. Whiteside had seen and what his testimony would be" at trial. Trial counsel stated that he visited the scene three times and that he went to Mr. Whiteside's property and took photographs of Mr. Whiteside's vantage point of the foray. Trial counsel opined that Mr. Whiteside's viewpoint was approximately 200 yards away from where the encounter took place. The "reasonableness" of trial counsel's investigation includes information provided by the Defendant. See Cribbs, 2009 WL 1905454, at *49.

-50-

Nonetheless, we do agree that trial counsel's text message to the Defendant that he would still interview Mr. Whiteside is somewhat "concerning." However, even if trial counsel was deficient, the Defendant has failed to demonstrate that he was prejudiced by this failure. We cannot conclude that Mr. Whiteside's testimony would have materially aided the defense by providing "extremely significant" corroboration of the Defendant's version of events. Although Mr. Whiteside maintained that he did not see anything "shocking" about the Defendant's driving that day, Mr. Whiteside's testimony that the Defendant drove past his house before returning "two or three minutes later" would have confirmed the other witnesses' testimony that the Defendant was out looking for the victims. The victims' mother's testimony at trial corroborated the Defendant's version in that she testified that the Defendant stopped at Mr. Whiteside's house and that Mr. Whiteside was working on his mower, although she testified that the stop was much quicker than Mr. Whiteside. Mr. Whiteside also testified that the Defendant appeared agitated and upset that someone had threatened the Defendant's wife, which was contrary to the Defendant's claim at the motion for new trial hearing that he "was very calm" that day.

In addition, Mr. Whiteside did not see "it all take place" as the Defendant contended. He was approximately 200 yards away from the foray. Mr. Whiteside testified that, when he looked up after the first shots that he could not see either victim, which would not have placed the adult victim in a position to be a threat to the Defendant. Mr. Whiteside's testimony suggested that the minor victim was still behind the house, which would have positioned her close to the altercation. Finally, Mr. Whiteside stated that, after the initial gunshots, he walked towards the Defendant and the adult victim to see better, but he "really didn't see a whole lot after that." Any indication that the Defendant called the adult victim a "boy," and that the adult victim replied by saying "[w]ho are you calling a boy," confirmed that the altercation was unfriendly. Accordingly, we agree that Mr. Whiteside did not provide testimony that would have helped the Defendant establish that his actions were justified.

Moreover, while the Defendant claimed that he was only trying to protect himself, he fired four warning shots. The Defendant admitted that he never saw the adult victim with a weapon, but he claimed that he did "have a right" to see the adult victim's hand based upon the adult victim's actions that evening. The adult victim was no longer on the Defendant's property when this incident took place. The Defendant's wife testified that the Defendant was upset when he left the house. The Defendant said during his 911 call that he "just didn't like someone walking on [his] private property." The Defendant stated to Detective Collins that he got "into his truck and [went] after [the victims]" and admitted that he drove "up and down the road a couple of times looking for them." The Defendant also told Detective Collins that he exited his truck "with his gun to his side" rather than claiming that he returned to his truck to retrieve his weapon. Furthermore, the

Defendant expressed to Detective Collins that he fired the rounds "in the ground beside [the adult victim]." The Lovens also witnessed the Defendant's actions, confirming much of the victims' version. We agree with the trial court that the Defendant has failed to demonstrate that he was prejudiced by trial counsel's failure to interview Mr. Whiteside or call him as a witness.

Next, the Defendant notes that the events occurred in the Coxes' front yard. Although trial counsel testified that he did interview Mrs. Cox, he did not call her as a witness at trial. The Defendant asserts that Mrs. Cox, who was home when the altercation occurred, "had favorable testimony for the defense" because she would have testified that she did not see the minor victim or the victims' father "when she looked outside just after the shots" were fired. Moreover, the Defendant maintains that Mrs. Cox's testimony "also would have impeached Misty Loven['s testimony] because [Mrs.] Cox did not come out until the shooting was over and saw Loven also coming out at that time."

Mr. Cox was not interviewed. According to the Defendant, Mr. Cox "could have provided exculpatory evidence in a very simple way" by testifying that he did not arrive until after the incident was over and that he saw the victims' father "coming up through the yard" upon his arrival. In the Defendant's opinion, this testimony would "have further impeached the story told by [the victims' father] as an eyewitness." In addition, the Defendant notes that Mr. Cox helped "find the slugs," which he located "way out in the field, not close to the house where the altercation occurred." The Defendant submits that this amounted to "exculpatory testimony on the key issue of whether [the Defendant] fired warning shots[] off to the side as he stated or if there was dirt flying at the [victims] as they claimed."

In regards to testimony from the Coxes, the trial court similarly determined that the Defendant was not prejudiced because their testimony

> did little to nothing to change or discredit the State's proof . . . . The minor
> discrepancies that these . . . witnesses would have created in the trial do not
> in any way take away from the core facts that the jury heard. [The
> Defendant] testified that there were no threats made to him by [the adult
> victim] prior to him firing the pistol in his direction.

The Defendant has failed to establish that he received ineffective assistance in this regard. Trial counsel did interview Mrs. Cox and determined that neither of the Coxes witnessed the incident. When Mrs. Cox looked outside after hearing what "sounded like backfiring," she saw the adult victim standing near "a pine tree" and the Defendant's white truck being driven away. Her testimony indicated that she did not see anything until the altercation was over. In addition, Mrs. Cox's testimony that she did not see the

minor victim at that time only corroborated the State's version that the minor victim went running home after the initial shots were fired. No one asserted that the victims' father was extremely close to the altercation, and Mrs. Cox clarified that she "just stayed right there kind of on the carport[.]" While Mrs. Cox could not recall hearing any raised voices or "squealing tires or anything like that," she acknowledged that the living room where she was watching television with her mother was "back away from the road[.]" She further indicated that the volume on the television was likely loud because her mother was hard of hearing and that it, therefore, would not "be unusual" for her to fail to hear those sounds.

Whereas, Mrs. Loven testified at trial that, after hearing two gunshots that seemed "awful close" to her house, she looked out her window to see the victim and the Defendant's white truck "in the field." Mrs. Loven averred that, before she exited her home, she had already seen the minor victim running towards her parents. Mrs. Loven relayed that she went outside after hearing the third shot but before the fourth shot was fired. The first 911 call made by the adult victim corroborated Mrs. Loven's testimony that she witnessed the events. Mrs. Cox, on the contrary, did not witness any of the events until after the altercation had ended and the Defendant was driving away. Mrs. Cox's testimony that she saw Mrs. Loven "coming out" of her house at that time did little to discredit Mrs. Loven's version.

Eddie Cox was not present at the time of the incident. At the motion for new trial hearing, Mr. Cox described that, when he arrived shortly after the altercation occurred, he saw the minor victim crying and saw the victims' father coming up the hill from his house. Again, none of the State's witnesses claimed that the victims' father was extremely close to the altercation, and at least several minutes had passed before Mr. Cox's arrival. The victims' father could have easily returned to the house and come back outside again in the time it took for Mr. Cox to arrive. Furthermore, Mr. Cox relayed that he found two slugs "far apart" in "the field." This was consistent with the victims' testimony that the gunshots sprayed dirt on them when they struck ground. Moreover, Mr. Cox was not in a position to specify the location of the slugs in relation to the victims. We fail to see how this amounted to "exculpatory testimony on the key issue of whether [the Defendant] fired warning shots[] off to the side as he stated or if there was dirt flying at the [victims] as they claimed."

We agree with the trial court that these "minor discrepancies" did "little to nothing to change or discredit the State's proof[.]" Testimony from the Coxes would not have materially aided the defense. Accordingly, the Defendant has failed to demonstrate either deficient performance or prejudice with regard to trial counsel's failure to interview Mr. Cox or call Mrs. Cox at trial.

## B. *Trial Preparation*

Regarding trial counsel's duty to generally investigate the criminal allegations against the Defendant, the Defendant maintains that trial counsel's preparation "was unreasonable under the prevailing professional norms" and cites in support Mr. Isaacs's testimony. The Defendant remarks that trial counsel's "criminal files did not contain any investigative memorandums, emails, notes, time records, trial outlines or anything indicating preparation for trial[,]" like "questions for voir dire," specific "questions he planned to ask the witnesses," or a draft of his opening and closing statements. The Defendant further asserts that trial counsel "did not take advantage of the opportunity to investigate [the Defendant's] criminal case by obtaining discovery in the collateral civil case that was filed against [the Defendant] on August 6, 2015[,]" noting that trial counsel did not take depositions of key witnesses and never "requested from the [victims] answers to interrogatories or the production of documents." According to the Defendant, "[h]ad trial counsel taken advantage of the discovery opportunities in the civil case," trial counsel would have learned details about the witnesses' trial testimony, would have been better prepared for cross-examination of the State's witnesses, and would have been able "to impeach the false testimony" of the adult victim and the victims' father. The Defendant concludes that trial counsel's "failure to take advantage of the discovery opportunities in the civil case rendered the result of [his] trial unreliable."

We decline to waive this issue as the State requests because, contrary to the State's assertion, the issue was raised in the Defendant's motion for new trial. In his motion for new trial, the Defendant alleged that "[t]rial counsel failed to conduct an adequate thorough pretrial investigation into the facts and circumstances of the case[.]" In issuing its ruling, the trial court noted "that [trial counsel] certainly did not conduct the most thorough investigation and certainly did not try a flawless case[.]" However, the trial court concluded "that those errors did not rise to the level of ineffective assistance of counsel under the law when analyzed under the facts of this case." The trial court reasoned that trial counsel "was confronted with a situation where the facts of the case provided to him from the State through the discovery process as well as the information provided to him by his client both support a finding of guilt." The trial court determined, "[The Defendant] testified that he told [trial counsel] the facts of the case during their first meeting and those facts simply did not provide [trial counsel] with room to craft a defense."

Trial counsel's testimony established that he met with the Defendant on numerous occasions, reviewed strategy and potential questions, gathered information, and advised the Defendant about cross-examination strategy. Trial counsel testified that he reviewed the discovery materials, including listening to the 911 calls. Trial counsel visited and photographed the scene. Trial counsel maintained that he discussed the dangers of going

-54-

to trial with the Defendant. Trial counsel indicated that he reviewed the Defendant's civil deposition with him and critiqued his performance in preparation for trial. Moreover, trial counsel testified that he found the Defendant's version quite credible and hoped the jury would find the same. The Defendant has not provided this court with any caselaw requiring trial counsel to prepare any written documents, such as memorandum, notes, or outlines, in preparation for trial. The Defendant did not ask trial counsel about the absence of these written documents from his investigative file. Accordingly, we conclude that the Defendant has failed to show deficient performance or prejudice based upon trial counsel's pre-trial preparation and investigation.

Furthermore, we cannot conclude that trial counsel's representation of the Defendant in his civil case amounted to ineffective representation in this post-conviction case. Criminal rules allow for only limited discovery. See Tenn. R. Crim. P. 16; see also State v. Singleton, 853 S.W.2d 490, 495 (Tenn. 1993). Trial counsel will rarely have civil discovery tools available. Moreover, Mr. Isaacs's testimony indicated that the better avenue would have been to request a stay of the civil proceedings in their entirety. Most importantly, the Defendant incriminated himself in his statement to Detective Collins. The Defendant failed to establish what additional information deposing the victims would have revealed. Accordingly, the Defendant has failed to establish his factual allegations in this regard by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f).

## C. *Cross-Examination of the Victims' Father*

The Defendant argues that trial counsel's failure to familiarize himself with the various 911 recordings precipitated his ineffective cross-examination of the victims' father, whose testimony "went to the heart of the dispute." The Defendant remarks that the victims' father testified "as an eyewitness" at trial and that his testimony supported the adult victim's "version almost entirely"; however, on the 911 recording, the victims' father stated, "I don't really know what happened." Trial counsel, in the Defendant's opinion, failed to impeach the victims' father because trial counsel "mistook another 911 caller for [the victims' father] and because [trial counsel] had not prepared a transcript of the 911 calls and did not have any notes or outline prepared for cross-examination" of the witness. According to the Defendant, effective impeachment of the victims' father "would have indicated to the jury that the [family] fabricated and embellished their version of events" by contradicting the victims' father's claim that he was an eyewitness to the crime and, thereby, would have buttressed the Defendant's theory of self-defense.

The trial court determined that "the claims of false statements by prosecution witnesses to be insufficient to constitute a basis for new trial." Addressing the Defendant's allegations regarding the victims' father's false testimony, the trial court noted that the victims' father "was questioned under oath about what he saw and answered accordingly." The trial court surmised "that the jury heard all the 911 calls and

was certainly in a position to evaluate [the victims' father's] credibility and to determine whether or not his story changed."

The Defendant, in addition to alleging that the victims' father testified falsely at trial, argued in his motion for new trial that trial counsel was ineffective for failing to impeach the victims' father with "his prior [911] statement that undermined his trial testimony," but rather, "trial counsel mistakenly attempted to impeach the witness with 911 statements that were made by someone else and this cross-examination in effect supported the State's case[.]" Again, we decline the State's invitation of waiver for failure to raise the issue in the motion for new trial.

Trial counsel acknowledged that he made a mistake during his cross-examination of the victims' father. Regardless, the jury heard the 911 calls and was able to evaluate that evidence. The Defendant observes that the calls from Mr. Drinnon and the victims' father were "substantially different." On redirect examination, the victims' father clarified that he was "not the caller on 911 from 1736 Boatmans Ridge who talked about firecrackers." In addition, despite asking the victims' father about whether he believed the gunshots might have been fireworks, trial counsel also inquired about whether the victims' father said to the 911 operator that he did not know what happened. Thus, despite the error regarding the fireworks portion of the 911 call, trial counsel's cross-examination of the victims' father did dispute his claim that he was an eyewitness to the crime. The victims' father indicated that any statement that he did not know what happened was likely referencing the events that occurred in the Defendant's yard and not when the Defendant fired the shots. We agree with the trial court that the victims' father's credibility was a determination for the jury, and it was the jury's prerogative to determine whether that story changed from the 911 call to trial. As such, the Defendant has failed to show that he received ineffective assistance in this regard.

D. *Cross-Examination of the Adult Victim*

The Defendant contends that trial counsel failed to adequately cross-examine the adult victim by allowing a false statement "to go unchallenged." Specifically, the Defendant challenges trial counsel's failure to obtain certified copies of the adult victim's criminal convictions and question the adult victim about those convictions after the adult victim testified that he had "a clean record." According to the Defendant, when the adult victim made this statement, he opened the door to impeachment evidence of his prior convictions. The Defendant notes that trial counsel not only failed to cross-examine the adult victim further but ended up apologizing to the adult victim in front of the jury. The Defendant submits that, had trial counsel investigated the adult victim's background "through Westlaw's People Finder[,]" then he would have discovered "'several convictions,' including a prior conviction for felony DUI[,]" reckless driving, and possession of marijuana and drug paraphernalia.

-56-

Again, the trial court determined that "the claims of false statements by prosecution witnesses to be insufficient to constitute a basis for new trial." As this claim related to the adult victim, the trial court reasoned that the adult victim's "testimony that he had a clean record to be in response to [trial counsel's] incorrect statement that [the adult victim] had a felony record." The trial court surmised that the adult victim "was not attempting to mislead the jury but was responding to the assertion that he was a convicted felon." The trial court additionally reasoned, "The [c]ourt hardly finds a conviction for reckless driving or simple possession and drug paraphernalia to be crimes of dishonesty that would impact a witness's character for truthfulness."

We again reject the State's claim of waiver. The Defendant submitted in his motion for new trial that trial counsel failed to research the criminal history of the adult victim and "was therefore unable to effectively cross-examine him after the witness's false statement regarding his record."

Addressing the Defendant's claim, we note that trial counsel testified that he conducted background checks on all potential witnesses before trial utilizing a service provided by Westlaw. Although reference was made to a felony DUI at the motion for new trial hearing, there was no evidence introduced that the adult victim, in fact, had any felony convictions. From our review of the record, we are constrained to agree with the trial court that the adult victim's statement that he had a "clean record" was a tailored response to trial counsel's question, "But you are a convicted felon, are you not?" Therefore, we cannot conclude that the adult victim opened to the door to questioning about his two misdemeanor convictions.

Moreover, the adult victim's version was corroborated by the other eye witnesses, including the Lovens. The Defendant acknowledged that the adult victim did not threaten him and that he did not see a weapon. We cannot conclude that the result of the proceeding would have been different had the adult victim been asked about these two misdemeanors. The Defendant has failed to establish his claim of ineffective assistance on this ground.

E. *Failure to Prepare the Defendant to Testify and Object on Cross-Examination*

The Defendant argues that the State's "cross-examination of [the Defendant] about the veracity of other witnesses," and specifically whether the Defendant believed the minor victim was lying, violated the Tennessee Rules of Evidence. The Defendant notes that the State made no attempt to lay a foundation regarding the Defendant's familiarity with the minor victim when the Defendant was asked to comment on whether she was lying. The Defendant cites to caselaw from other jurisdictions in support of his argument, including United States v. Freitag, 230 F.3d 1019, 1024 (7th Cir. 2000). However, the Defendant acknowledges this court's decision in Charles A. Walker v.

State, No. M2010-00449-CCA-R3-PC, 2011 WL 795866, at *22 (Tenn. Crim. App. Mar. 8, 2011), wherein this court found a similar allegation to be without merit. Nonetheless, the Defendant surmises that trial counsel should have objected to this line of questioning and that trial counsel's failure to do so, "and the trial court's allowance of the inflammatory exchange[,]" resulted in prejudice to the Defendant "and the judicial process."

Yet again, the State argues for waiver alleging that the Defendant failed to raise the issue in his motion for new trial. The trial court did not specifically address the issue in its order denying the Defendant's motion for new trial. However, in the Defendant's motion for new trial, the Defendant argued that trial counsel failed to object to the State's improper cross-examination of the Defendant "in which the prosecutor asked [the Defendant] to comment on the veracity of other witnesses" and that trial counsel failed to prepare the Defendant to testify, including failing to inform him that it was "always harmful to claim another witness is 'lying' when in fact that calls for speculation." Waiver is not appropriate.

In Walker, this court addressed a petitioner's allegation that trial counsel was ineffective when he asked the witness if the testimony of another witness was a lie. 2011 WL 795866, at *22. The court concluded as follows:

> The [p]etitioner cites to a Federal case from the seventh circuit that holds that, "Because credibility questions are for the Jury, it is improper to ask one witness to comment on the veracity of the testimony of another witness." See []Freitag, 230 F.3d 1019 []. In Freitag, the counsel for the prosecution asked the defendant, who testified, whether she herself was being truthful and whether other witnesses were being truthful. Id. at 1024. The Freitag court ultimately held, "Assuming arguendo that all the questions Freitag objects to are improper, we find the resulting error to be harmless." Id. We can find no Tennessee case adopting a holding that counsel for the defense or prosecution may not ask a witness whether another witness is truthful. The [p]etitioner is not entitled to post-conviction relief on this issue.

Id. While the Defendant observes that "Tennessee courts have not specifically held that it is improper for one to comment on the veracity of the testimony of another witness," he invites us to reach a different conclusion from the Walker court regarding his allegation of ineffective assistance of counsel. We decline this invitation.

Additionally, the Defendant remarks that he "was subjected to similar improper questioning" during his deposition in the civil case, wherein he affirmatively stated that the witnesses were lying. According to the Defendant, trial counsel never advised him

"before or after the deposition not to comment upon the veracity of other witnesses" but, instead, told him that he had done a good job answering the questions posed to him and should testify similarly at trial. The Defendant maintains that trial counsel "had a duty to adequately prepare [the Defendant] to testify at both his deposition and his trial."

Trial counsel testified at the motion for new trial hearing that he reviewed the Defendant's civil deposition with him and critiqued his performance in preparation for trial. Contrary to the Defendant's testimony at the hearing, trial counsel maintained that the Defendant "appeared to be very agitated, very angry, very confrontational" in his deposition and that he "[e]xplained to [the Defendant] it was a train wreck if . . . he testified the same way in the jury trial that he would definitely be convicted." Trial counsel further testified that he also reviewed potential questions with the Defendant although they never specifically discussed "the lying question, is somebody lying[.]" Furthermore, as we held above, we cannot conclude that trial counsel's representation of the Defendant in his civil case amounted to ineffective representation in his criminal case. Most importantly, the Defendant's deposition in the civil case was not used against him in his criminal trial, and the Defendant incriminated himself in his statement to Detective Collins. Accordingly, we conclude that the Defendant has failed to show deficient performance or prejudice in this regard.

## F. *Plea Negotiations*

The Defendant alleges that "[t]rial counsel rendered deficient performance during pretrial negotiations and prejudiced [the Defendant] by depriving him of the opportunity to get probation and by failing to evaluate and explain the consequences of not accepting probation." We again refuse the State's waiver request because the Defendant raised this issue in his motion for new trial, claiming therein that "[t]rial counsel did not adequately advise the Defendant of the State's plea offer of full probation or of the consequences of not accepting it[.]"

The Defendant continues that "[t]here is a reasonable likelihood that resolution would have occurred if counsel had adequately explained and pursued [the Defendant's] options during plea bargaining." The Defendant testified that he would have accepted an offer of probation but such an offer was never conveyed to him and that trial counsel, in fact, encouraged him to proceed to trial. He notes that his son Matthew's testimony corroborated his account. Moreover, the Defendant references trial counsel's testimony that the Defendant and his family had trouble understanding "why [the Defendant] could not plead to the felony and still request diversion" and trial counsel's admission that "he never advised [the Defendant] of the dangers of going to trial and claiming self-defense when one of the alleged victims was a child." The Defendant surmises that it was trial counsel's responsibility to explain the State's offer to him, helping him understand this "important decision" and allowing him "to make a reasoned choice." In conclusion, the

Defendant maintains that "trial counsel failed to explain the perils [the Defendant] faced if [he] went to trial and what to expect if he was convicted." The Defendant theorizes that he "was prejudiced by . . . trial counsel's failure to advise him of the risks of trial and to explore obtaining an offer of probation, which [the Defendant] testified he would have accepted."

The trial court first concluded that there was "insufficient proof to support the claim that [trial counsel] failed to relay an offer from the State." The trial court noted that it had listened to the stipulated testimony of the prosecutor "in which she indicated that [trial counsel] was advised that one victim would agree to probation on [a]ggravated [a]ssault but that she was not in a position to approach the other victim to see if she could make such an offer unless the [D]efendant would be willing to accept it." The trial court explained "that from the stipulated testimony it [was] abundantly clear that no offer of probation was ever conveyed to [trial counsel] or [the Defendant]" and that "[the Defendant] made it clear to [trial counsel] that any felony plea offer would have to contain diversion as a component of it." The trial court determined that trial counsel was not "ineffective for failing to relay a nonexistent offer to [the Defendant]." The trial court continued,

> The [c]ourt is of the opinion that [trial counsel] could certainly have further attempted to persuade [the Defendant] to authorize him to make an offer to the State to plead guilty to [a]ggravated [a]ssault with either straight probation or split confinement but does not find the failure to do so to be ineffective assistance of counsel. [Trial counsel] testified that he does not pressure clients to take plea offers from the State and leaves it up to them. [Trial counsel's] testimony made it clear that he attempted to work the case out in [g]eneral [s]essions [c]ourt but was unable to do so and thus conducted a preliminary hearing forcing the State to establish probable cause. [Trial counsel] then continued to discuss the case with [the Defendant] and his family as evidenced by the text messages introduced in the motion for new trial . . . as well as the testimony of [trial counsel], [the Defendant], and Matthew Ailey. [Trial counsel] repeatedly attempted to resolve the case on the terms that [the Defendant] wanted but was unable to do so and thus went to trial to make the State prove its case.

The trial court also concluded that "[trial counsel] sufficiently informed [the Defendant] of his options to meet the constitutional mandates of effective assistance of counsel." The trial court explained "that [the Defendant] was correctly informed by [trial counsel] that going to trial did not prevent him from making application for diversion, and in fact, that is exactly what happened in this case[,]" and said application was denied. The trial court determined as follows:

It is clear to the [c]ourt from the testimony of [the Defendant] and [trial counsel] that [trial counsel] discussed things such as the difference between a felony and misdemeanor, the benefits of trying to plea to a reduced charge, as well as possible ways that [the Defendant] could obtain a diversion; however, the District Attorney General's Office was unwilling to endorse either such option; thus, [the Defendant] and [trial counsel] elected to go to trial. [The Defendant] is a sophisticated businessman and co-owner of a successful construction company in Hamblen County that has built a number of commercial structures; therefore, [the Defendant] is not an individual who lacked the acumen to understand what [trial counsel] was relaying to him or the potential ramifications of going to trial. [Trial counsel] further discussed concerns about the case with Matthew Ailey, [the Defendant's] eldest son and proprietor of a financial services company. After the conversation with Matthew Ailey, [the Defendant] sent a text message to [trial counsel] saying ". . . thank you for taking the time to discuss things with my son. He feels really much better after talking to you. He thinks we are in good hands with you."

Trial counsel has a duty to timely communicate formal plea offers to a defendant, see Missouri v. Frye, 566 U.S. 134, 145 (2012), and to render effective assistance in advising a defendant whether to accept a plea offer, see Lafler v. Cooper, 566 U.S. 156, 162 (2012). Here, according to the stipulated testimony of the prosecutor, she did not extend a formal plea offer of probation to the Defendant but rather informally inquired if he would be willing to plea as charged in exchange for probation. She did not want to upset one of the victims if the Defendant would not accept such an agreement. Trial counsel testified that he discussed this informal offer with the Defendant and that the Defendant was not interested. The prosecutor indicated that trial counsel spoke with the Defendant and relayed his desire to proceed to trial. The prosecutor stated that "was the last negotiation that [they] had." While no formal offer was ever made, trial counsel did convey the informal attempt to reach a plea agreement with a probationary sentence.

Trial counsel testified that he had desired to negotiate a plea agreement that would allow the Defendant to plead to a misdemeanor and obtain diversion. When they could not reach an agreement in general sessions court, they proceeded with the preliminary hearing, and plea negotiations continued. According to trial counsel, the Defendant was insistent that he would not accept a felony on his record, that he did not want to serve time in confinement, and that he did not want to be the subject of media attention. Trial counsel stated that he discussed a potential plea agreement with the Defendant multiple times and that he also had discussions with the Defendant's wife and son. Despite some confusion, trial counsel attempted to explain that the Defendant could not accept a deal of probation and still apply for diversion. At the motion for new trial hearing, the

-61-

Defendant again relayed his desire to enter a plea agreement that included diversion. However, the Defendant confirmed that trial counsel told him that diversion was not an option because the victims opposed such an agreement. Trial counsel indicated that he discussed the Defendant's options with him and the dangers of going to trial but that the ultimate decision of whether to enter a plea resided with the Defendant.

According to trial counsel, the Defendant consistently maintained while the case was pending that he was not guilty. Trial counsel testified that he found the Defendant's version credible and hoped that a jury would find the same. Trial counsel confirmed that he did not recommend to the Defendant that he enter an open plea because "[h]e would have no guarantee of not having jail time[.]" The Defendant was, just as advised by trial counsel, able to seek diversion following the guilty verdict. When trial counsel was asked if he told the Defendant that "he was likely to get diversion," trial counsel said, "I told him I thought he was one of the best candidates I had ever seen for a diversion and I could not imagine a reason the [c]ourt would not grant him a diversion." Moreover, while trial counsel admitted that he should have focused more on the potential effect a ten-year-old victim would have had on a jury, the Defendant was not entitled to perfect representation, only constitutionally adequate representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Again, we make every effort to eliminate the distorting effects of hindsight. Howell, 185 S.W.3d at 326. We agree with the trial court's well-reasoned findings and conclusions regarding trial counsel's performance during the plea bargaining process. The record reflects that the Defendant made an informed decision to proceed to trial. The Defendant is not entitled to relief.

## G. *Cumulative Error*

The Defendant seemingly argues that trial counsel's multiple alleged deficiencies cumulatively affected the outcome of the proceedings to his prejudice. The Defendant states the alleged deficiencies and concludes that "[t]here is a reasonable probability that the verdict or sentence would have been different if [the Defendant] had received the effective assistance of counsel." In support of his argument, the Defendant cites to Jay Dee Garrity v. State, No. M2016-01463-CCA-R3-PC, 2018 WL 1691296, at *13-14 (Tenn. Crim. App. Apr. 4, 2018), wherein this court held that trial counsel was ineffective for failing to conduct an effective cross-examination of the victim and her mother by making "very little attempt . . . to discredit the [witnesses] despite numerous opportunities to do so." However, because we have found no single instance wherein trial counsel was deemed ineffective, there is no basis to conclude that any cumulative error resulted in an unfair trial.

# III. Additional Issues

At the conclusion of his brief, the Defendant states the following as "additional issues":

> 1. Asking [the Defendant] to comment on the veracity of other witnesses, including a child, as briefed in Section I, constitutes plain error under Rule 36(b) of the Tennessee Rules of Appellate Procedure.
>
> 2. Trial counsel was ineffective for failing to request, and the trial court committed reversible error by failing to instruct, the lesser included offense of reckless aggravated assault. [The Defendant] recognizes that this issue is not recognized under current law. (See III, 406-407).

The Defendant has failed to designate these as issues presented for review on appeal or develop any argument with regard to them. Neither is listed in the Defendant's statement of the issues. Additionally, the Defendant does not cite to any authority or reference the record in support of his first issue. As for the Defendant's second issue, he admits that current jurisprudence does not support his argument, and his citation to the record is merely a reference to his "supplemental memorandum" in support of his motion for new trial. The Defendant provides nothing beyond these conclusory allegations of trial court error.

Rule 27(a)(4) of the Tennessee Rules of Appellate Procedure requires that an appellant's brief include a statement of the issues presented for review. "[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn[essee] R[ule] App[ellate] P[rocedure] 27(a)(4)." Hodge v. Craig, 382 S.W.3d 325, 335 (Tenn. 2012). Rule 27 also requires that the appellant's brief contain an argument setting forth "the contention of the appellant with respect to the issues presented, and the reasons therefore, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record." Tenn. R. App. P. 27(a)(7)(A). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Likewise, the rules of this court establish that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Accordingly, we agree with the State that the Defendant has waived these two issues by failing to include them in his statement of the issues and by failing to support them with argument, citation to authority, or references to the record.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE